[No. 52944–2. En Banc. December 23, 1987.]

CHARLES F. PERRY, ET AL, *Appellants,* v. JUDITH MORAN, *Respondent.*

692

*Tousley, Brain, Reinhardsen & Block,* by *William H. Block* and *Christopher I. Brain,* for appellants.

*Lucas, Glase, Sherman & Hendrickson, Peter J. Lucas,* and *Merrilee A. MacLean,* for respondent.

CALLOW, J.—The plaintiff, Perry, Whittemore and Tanner (PWT), is a Seattle accounting firm. In 1981, the firm consisted of 4 partners, 18 or 19 staff accountants, and 25 to 30 support employees. The firm was organized into three basic departments, including the Retirement Department for which the defendant, Judith Moran, was hired.

The defendant, Moran, began her career as an accountant in Michigan in 1972, performing retirement plan work. In 1976, she left the company she was working for to start her own practice in the same area, taking a major part of her initial client base from among her first employer's clients with the employer's consent. Moran practiced on her own in Michigan from 1976 to 1980, when she sold her practice.

After selling her Michigan accounting practice, Moran moved to Seattle, where she took a position with City College as an administrator and teacher of accounting. She did not develop an accounting practice in Seattle during the time she was employed with City College.

In June of 1981, Moran accepted a position with PWT as the head of its Retirement Department. At the time she began working for PWT, Moran executed an employment agreement, which included the following provisions:

Section 5. Non–Competition.

5.1 Clients. Employee recognizes and acknowledges that all clients and/or accounts serviced by Employer, Employer's other employees, or Employee during his employment with Employer, including all clients and/or accounts acquired by Employee due to his efforts, are the clients and accounts of Employer (collectively "Client Accounts").

5.2 Non–Disclosure. Employee recognizes and acknowledges that the list of Employer's Client Accounts, as it may exist from time to time, is a valuable, special and unique asset of the Employer's business. Employee shall not, during or at any time after the term of his employment, disclose the list of Client Accounts or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever.

5.3 Restrictive Covenant. In the event this Agreement is terminated by either party, Employee shall not, either individually or as an employee or principal of another accounting or business firm, provide services to any Client Accounts within a five–year (5) period immediately subsequent to his termination of employment.

5.4 Additional Remedy. If for any reason Employee shall (i) acquire or otherwise obtain from Employer, by any means whatsoever, Client Accounts or provide services to such Client Accounts, then at the sole election of Employer, Employee shall pay to Employer fifty percent (50%) of the actual fees billed or billable to such Client Accounts by Employee each year for a period of three (3) years commencing with the date Employee first renders services to such Client Accounts.

Payment will be remitted to Employer by Employee with [*sic*] fifteen (15) days after collection of amounts billed by Employee to Client Accounts, or within sixty (60) days of billing by Employee to Client Accounts, whichever comes first. If services rendered by Employee to Client Accounts are provided on an on–going basis of sixty (60) days or longer, progress payments will be made by Employee to Employer at (60)–day intervals based on progress billings by Employee to Client Accounts.

The foregoing remedy shall be in addition to any other remedies provided to Employer hereunder or by law.

Moran was employed with PWT for slightly more than 1 year. Under her supervision, the PWT Retirement Depart-

ment was comprised of herself, Robert Ellis, a senior staff accountant, and Ruth Wett, an administrative staff member. Together they provided services that centered on the preparation of returns and filings related to retirement plans and defined benefit plans for professional service corporations.

Because of the nature of the PWT Retirement Department's work, much of its accountant–client contact came through clients, attorneys or outside general accountants. During her employment with PWT, Moran met a number of PWT clients and intermediaries.

On August 15, 1982, Moran gave notice of her intent to leave PWT, and on October 14, 1982, she terminated her employment. Shortly thereafter, Ellis and Wett also left PWT and joined Moran in a combined practice offering services similar to those performed by the PWT Retirement Department.

Soon after leaving PWT, Moran mailed notices of her new business to numerous individuals and companies who might offer client referrals. About 6 months later, she sent copies of a brochure describing her accounting practice to another list of people. While no notices or brochures were sent to actual PWT clients, some were sent to intermediaries of PWT clients who Moran had met while employed at PWT. The client intermediaries whom Moran contacted referred clients to her, including some who had been PWT clients during Moran's employment with PWT. During the 17 months between the time Moran left PWT and trial, she performed over $78,000 worth of services for clients who had been PWT clients during her employment with PWT.

Upon learning that Moran was servicing former PWT clients, PWT requested that she pay liquidated damages in accordance with section 5.4 of the employment agreement. When she refused, PWT filed the present action seeking either an injunction prohibiting Moran from servicing PWT client accounts or damages.

Trial commenced in June 1984. At the close of PWT's case, Moran moved for dismissal and the court granted the

motion. The trial court based its determination in part on the following findings of fact:

16. Certain of the clients for whom Judith Moran provides accounting services are individuals or companies which had been clients of PWT, but had left PWT some time prior to being referred to Judith Moran. Some had left PWT prior to October 15, 1982, and others had left after October 15, 1982.

17. At no time did Judith Moran, directly or indirectly, solicit any active client of PWT.

18. At no time did Judith Moran, directly or indirectly, divert from PWT the accounting business of any active client of PWT.

19. No harm has resulted to PWT by the fact that former clients of PWT have sought and received accounting services from Judith Moran, as opposed to other accountants or accounting firms.

20. The effort to restrict Judith Moran from servicing clients who have already left PWT and are not active clients of PWT is a restraint which is greater than that which is reasonably necessary for the protection of the business or goodwill of PWT.

21. The effort to restrict Judith Moran from servicing clients who have already left PWT and are not active clients of PWT results in a degree of restriction of the public which is unnecessary, unwarranted and unreasonable.

22. The restrictive provisions of the Employment Agreement are unreasonable and should be modified so that they are reasonable and lawful.

23. Given the facts of this case, the restrictive provisions of the subject Employment Agreement should be modified so that Judith Moran would only be restricted from "soliciting or diverting" active clients of PWT.

24. In that there is no evidence that Judith Moran solicited or diverted active clients of PWT, plaintiffs' claims for damages and injunctive relief should be denied, and the preliminary injunction entered herein should be dissolved.

The trial court, in the judgment signed July 30, 1984, stated, *inter alia*:

The Employment Agreement between the parties herein executed on the 25th day of September, 1981, is

modified and reformed in all respects, including those clauses relating to remedies, so that the restrictive provisions contained therein restrict Judith Moran only from "soliciting or diverting active clients of PWT" through October 14, 1987.

The trial court also awarded Moran attorney's fees in the amount of $34,948.60.

The "findings of fact" entered by the trial court are to a great extent irrelevant to the issues presented. The case involves a contract of employment freely entered into between the parties and understood by the employee. The "findings of fact" by the trial court are, in reality, a rewriting of the agreement by the trial court and a stating of new terms for the agreement in the form of conclusions of law. The parties could contract that in return for employment the employee would agree that for a reasonable time she would not "provide services" to employer's clients. This is the heart of the agreement approved in *Racine v. Bender,* 141 Wash. 606, 252 P. 115 (1927) and *Knight, Vale & Gregory v. McDaniel,* 37 Wn. App. 366, 680 P.2d 448, *review denied,* 101 Wn.2d 1025 (1984). These decisions support the prohibition against the *performance of services* so that an employer can protect its client base without the necessity of proving the solicitation or diversion of clients (an evidentiary morass at best) but need only prove that the client of the employee had been the client of the former employer.

This case involves an attempt by an accounting firm, doing primarily accounting services for doctors and clinics, to protect its client base from a defecting employee to whom it has introduced those clients. It involves an employee who after only approximately 14 months' employment, long enough to ingratiate herself with the firm's clients, departs with an entire department and ends up with a number of those clients. It involves an employment agreement that specifies liquidated damages for the protection of the employer if the employee takes all or a portion of the employer's business.

The issue in this case is whether the trial court should have dismissed an action to enforce an accountant's covenant not to provide services to clients of a former employer after terminating employment or, in the alternative, to pay as liquidated damages 50 percent of any fees charged for services rendered to the former employer's clients for a period of 3 years. We hold that such a covenant is consistent with *Racine v. Bender, supra,* and is valid and enforceable. The trial court erred in dismissing the claim.

*Racine v. Bender, supra,* and *Knight, Vale & Gregory v. McDaniel, supra,* involve restrictive covenants as applied to employees of accounting firms. The circumstances of both cases are similar to the present case. In each of the three cases the employee signed a covenant not to perform work for clients of the former employer, but after leaving the employing firm, did perform work for those clients. In both *Racine* and *Knight,* the courts enforced the covenants as written. *Neither court required a showing that the former employee had solicited the employer's former clients.*

In *Racine,* the court upheld an employee's covenant which provided, in pertinent part:

"(d) For a period of three years after leaving such employment I will not:

"(1) *Solicit* accounting or auditing work from any person, firm or corporation with whom I came in contact as a representative of Samuel F. Racine & Co., *or*

"(2) *Perform* any accounting or auditing work, either acting for myself or for any other party, for any person, firm or corporation with whom I came in contact during my employment with Samuel F. Racine & Co. . . ."

(Italics ours.) *Racine,* at 607.

The *Racine* opinion stated that:

Roughly construed, these provisions prohibit respondent from soliciting or doing, within a period of three years, any work for any of those people whose desire for his services comes because through his work as a representative of the appellant he was enabled to acquire a knowledge of their business, or become intimate with the members of the staff of such business. . . . *In the broadest sense, the restriction is nothing more than to*

*prohibit respondent from taking appellant's clients with him when he severs his connection with appellant, or to perform services for those so intimately connected with such clients as to be fairly classified as his future clients. That such a requirement so accords with common honesty between men, and a failure to observe it leads to such direful results, is so well established that it seems strange that it should be contended that one engaged in a position where confidence is the basis of the relation between client and the employee and that confidence results through the employer and is the foundation stone of his business, then the employee may, disregarding his employer's rights, visit ruin upon him. The general rule applied in construing such contracts, is that restrictions therein are upheld, if they meet the test of showing that they are not greater than are reasonably necessary to protect the business or good will of the employer, even though they restrain the employee of his liberty to engage in a certain occupation or business, and deprive the public of the services, or restrain trade.*

(Italics ours.) *Racine*, at 610–11.

In 1984, the 3–part test for reasonableness of a covenant established in *Racine* was stated again in *Knight, Vale & Gregory v. McDaniel, supra* at 369, as follows:

Whether a covenant is reasonable involves a consideration of three factors: (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant.

Applying this test the court found reasonable a covenant prohibiting the employee from performing work for the employer's former clients for a period of 3 years. The court upheld the granting of summary judgment to the employer stating:

Absent disputed facts, the construction or legal effect of a contract, including the "reasonableness" of a covenant not to compete, is determined by the court as a

matter of law. *Marquez v. UW,* 32 Wn. App. 302, 648 P.2d 94 (1982); *Alexander & Alexander, Inc. v. Wohlman,* 19 Wn. App. 670, 684, 578 P.2d 530 (1978). The primary dispute between the parties concerns enforceability of the warranty agreement and the reasonableness of its covenant not to compete. The facts surrounding entering into the agreement and the acts constituting violation of the covenant are undisputed. Therefore, resolution of the issue by summary judgment was appropriate. *Yeats v. Estate of Yeats,* 90 Wn.2d 201, 204, 580 P.2d 617 (1978).

*Knight,* at 368. The court enforced the covenant's provision for liquidated damages of 35 percent of fees billed or billable to those clients within the 3–year period with the following observations.

Turning to the question of liquidated damages, the general rule is that such damage clauses are favored and are enforceable if they do not constitute a penalty or are otherwise unlawful. The test for enforceability of liquidated damages is (1) the amount fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach, and (2) the harm must be such that it is incapable or very difficult of ascertainment. Harm resulting to one business from the competition of another business is difficult to estimate accurately. Here, however, there was an expert's uncontroverted affidavit that the damages sought of 35 percent of any fees collected reflect no more than a reasonable forecast of the harm to the employer occasioned by a breach of the covenant. Because the formula is based upon a percentage of competing business actually occurring it is directly linked to the actual damage to goodwill experienced by the employer. In addition, the 35 percent figure is based upon a general formula in the accounting field for purchase of an ongoing practice. In short, the clause is not an arbitrary estimate of damages, is not a penalty and is enforceable.

(Citations omitted.) *Knight,* at 371–72. *See also Wood v. May,* 73 Wn.2d 307, 438 P.2d 587 (1968); *Columbia College of Music & Sch. of Dramatic Art v. Tunberg,* 64 Wash. 19, 116 P. 280 (1911).

When one examines the actions of the defendant in this

case under the light of the principles established by *Wood v. May, supra; Racine v. Bender, supra; Knight, Vale & Gregory v. McDaniel, supra;* and *Sheppard v. Blackstock Lumber Co.,* 85 Wn.2d 929, 540 P.2d 1373 (1975), those principles can only be upheld or the opinions reversed.

We find Judith Moran's covenant not to perform accounting work for PWT clients to be proper, reasonable and enforceable. PWT has a legitimate interest in protecting its existing client base from depletion by a former employee. It had a justifiable expectation that if it provided employment to an accountant, that employee would not take its customers. A covenant prohibiting the former employee from providing accounting services to the firm's clients for a reasonable time is a fair means of protecting that client base. A bargain by an employee not to compete with the employer during the term of employment or thereafter for a reasonable time and within a reasonable territory, as may be necessary for the protection of the interests of the employer without imposing undue hardship on the employee, is valid. Restatement of Contracts § 516(f) (1932). Such covenants encourage employment of accountants by accounting firms and they discourage the taking of the employer's clients without preventing the employee from engaging in the profession. *Wolf & Co. v. Waldron,* 51 Ill. App. 3d 239, 366 N.E.2d 603 (1977); *Faw, Casson & Co. v. Cranston,* 375 A.2d 463 (Del. Ch. 1977); 15 A.L.R.4th 559.

One unpleasant alternative for accounting firms and other employers who rely upon covenants not to compete to protect their business, if such covenants are not upheld, is to forever rotate the employees who service clients with other employees, thereby limiting employee–client contact as much as possible. Another unattractive alternative is constant management supervision or monitoring of the employee's work so that the client looks always to management rather than the employee for answers. It is readily apparent that forcing such courses of conduct upon an employer is costly, inefficient and would lead to unsatisfac-

tory firm–client relationships. No rule of law should force employers into such actions.

The defendant and the trial court suggest that PWT could adequately protect its client base by merely prohibiting a former employee from soliciting or diverting those clients from the employer. However, such a covenant would not adequately safeguard the employer's interest in retaining its clients. A covenant that merely prohibits solicitation or diversion places upon the employer the burden of proving (1) that the former employee performed some act or acts which had the potential of enticing clients away from the employer, and (2) that those acts were the cause of the client's decision to leave the employer and seek accounting services from the former employee. If this burden were placed upon an employer, the process would be difficult and expensive. The employer would be required to invest time and money in litigating the nature of the former employee's actions toward the clients. In many cases the employer would have to bring those clients into the litigation as witnesses to prove that solicitation occurred. Particularly where, as here, those clients are doctors, clinics and business corporations, an attempt to involve the clients in litigation would damage the goodwill existing between those clients and the employer, and would damage the reputation of the employer with potential clients. A prudent employer could not rely on such a covenant to protect its client base. It is reasonable for the employer to preclude the employee from servicing those who were clients of the employer during the period of employment and for a period after the cessation of employment.

The alternative would be for the employer to require employees to covenant not to practice accounting in the geographical area served by the employer. Such a covenant would be more restrictive upon the former employee, since it would require the former employee to either establish a practice outside the geographical region with which he had become familiar during his employment, or to forgo practicing accounting entirely for the period of time covered by

the covenant. A covenant not to compete within a geographical area places greater restrictions on the employee than does a covenant not to service the former employer's client accounts.

> The essential purpose of the post–employment restraint . . . is not to prevent the competitive use of the unique personal qualities of the employee—either during or after the employment—but to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment.

Blake, *Employee Agreements Not To Compete,* 73 Harv. L. Rev. 625, 647 (1960). In addition, covenants not to compete within a particular geographical area open up the employer to vexatious litigation to establish whether a court deems the size of the geographical area to be reasonable and litigation from the standpoint of the employer is to be avoided if possible.

A feasible alternative is proposed in a Seton Hall Law Review:

> The rules of the law that surround restrictive covenants strive to achieve a balance between the rights and duties of contending interests. By restricting the accountant covenantee from rendering professional services to clients of his or her former firm, the court is within the ambit of the traditional rules of restrictive covenant law although there may be some adverse effect on the public; that is, those clients who would prefer to enjoy the continued services of the accountant leaving the firm. That effect, however, is avoided or lessened if instead of granting injunctive relief, the court requires the former employee or partner to pay for the clients "taken." By providing the purchase price and terms in the agreement, the court's task is made easier and the likelihood of enforcement is enhanced. Thus, the legitimate interest of the employer is protected without imposing undue hardship on the employee or being overly injurious to the public.

Pachman, *Accountants and Restrictive Covenants: The Client Commodity,* 13 Seton Hall L. Rev. 312, 322 (1983). The PWT–Moran covenant achieves the balance advocated

by Pachman. By prohibiting Moran from providing any accounting services to PWT clients, the agreement clearly defines what actions are prohibited, making litigation unnecessary in most cases. Where litigation is necessary to enforce the covenant, the issue is limited to whether services were performed for the employer's clients which can be proven by producing billing records, making it unnecessary to involve clients in the litigation process. At the same time, the PWT–Moran covenant leaves Moran free to compete with PWT for new clients in the same geographical area. Indeed, the covenant even allows Moran to serve PWT clients, if she is willing to return one–half of her fees to PWT for a period of 3 years. This covenant is less restrictive than the covenant upheld in *Racine,* which was enforced by enjoining the former employee from servicing former clients of the employer, without an option to pay damages for the privilege of taking the clients.

Moran cites *Wood v. May,* 73 Wn.2d 307, 438 P.2d 587 (1968) to justify the trial court's modification of the covenant in this case. We recognize that a trial court has the power to modify a covenant so that it may be enforced to some extent, rather than invalidating the covenant entirely. However, such a modification is proper only where the original covenant is unenforceable. Here the original covenant was reasonable and should be enforced as written.

It is also proposed that restriction of competition for 5 years is perhaps too long and is therefore unreasonable. It is suggested that the cause should be remanded to the trial court for determination of that issue. We see no reason to adopt that proposal. First, the period of time between the defendant's leaving employment and trial was only 17 months. The 5–year period of restriction may have been too long a period of time but, in any event, the duration of the period has become irrelevant to the disposition of this case. The 5–year period restricting competition was not enforced by the trial court or germane to either the issue of *violation* of the covenant or the issue of damages. It may be that a clause forbidding service for a 5–year period is unreason-

able as a matter of law, but here, where the employee left the employment in October of 1982 and proceeded during the next year and a half to service the employer's clients, and that period is all that is involved in this litigation, and the employer has not sought damages beyond those computable at the time of trial; the length of the period, even if excessive, is immaterial. A remand on this issue would unfairly and unnecessarily impose upon the employer additional costly, burdensome litigation that the employment contract was designed to avoid.

The defendant contends that even if the covenant not to serve PWT clients is enforceable, the amount of liquidated damages for violation of the covenant is excessive. In *Knight*, the court upheld a liquidated damages clause requiring a former employee to pay 35 percent of fees billed or billable to a client of the employer or a total of 105 percent of annual fees. During the trial evidence was admitted that PWT was purchasing the right to service former clients of another accounting firm for a total of 135 percent of the annual fees billed to these clients. Since PWT voluntarily entered into this agreement, it was relevant to show that the percentage of fees to be paid under the covenant was reasonably within the range of fees normally paid by accounting firms for the right to service certain accounts. In her employment agreement, Judith Moran agreed not to service PWT client accounts, or if she did service the accounts, to pay 50 percent of the fees billed or billable to those accounts for a period of 3 years, or a total of 150 percent of the 1 year's fees. The record contains substantial testimony that this is a reasonable price to pay for permanently acquiring a client. There is testimony that others had entered into similar agreements and had paid liquidated damages in the same range for performing services for clients of prior employers. There was evidence that the liquidated damage provision in this agreement was typical of similar clauses in other employment agreements in the Seattle–Tacoma area.

We find that the amount owing for these accounts is

within the range of reasonable agreements for the transfer of the right to service accounts. *Isler v. Shuck,* 38 Or. App. 233, 589 P.2d 1180 (1979). We reject the approach of *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 15 A.L.R.4th 551 (1979). Whether a covenant not to compete is reasonable and enforceable or has been violated cannot be based upon the respective incomes or a comparison of the size of the parties involved or the amount of the damage suffered.

It follows that Moran, the former employee, should pay the ex–employer, Perry, Whittemore and Tanner, 50 percent of any fees billed or billable to former PWT accounts for a period of 3 years following her termination of employment with PWT.

The dismissal and the trial court's award of attorney's fees to the defendant are reversed. Judith Moran's covenant not to perform accounting services for PWT client accounts or, if such services were performed, to pay PWT 50 percent of any fees billed to those accounts for 3 years, is valid and enforceable. The cause is remanded to the trial court for further proceedings consistent with this opinion. *See Alexander & Alexander, Inc. v. Wohlman,* 19 Wn. App. 670, 578 P.2d 530 (1978). The award of attorney's fees for both trial and appellate representation shall abide the final disposition of the cause. RAP 18.1(e).

DOLLIVER, DORE, ANDERSEN, and DURHAM, JJ., concur.

UTTER, J. (dissenting)—This case concerns the reasonableness and enforceability of an employment contract's restrictive covenant and liquidated damages provision. In holding the noncompetition covenant reasonable and enforceable as written, the majority fails to consider the covenant's terms, ignores the trial court's findings of fact, and rules contrary to this State's general policy disfavoring contracts in restraint of trade. In addition, the primary cases relied on by the majority do not support the result reached. Unlike the majority, I agree with the trial court

that the covenant's terms were more restrictive than necessary to protect the employer's business and goodwill. However, I find the trial court's covenant modifications unreasonable and would alter them accordingly. As to the enforceability of the liquidated damages provision, on which the trial court did not entertain evidence or rule, I think it inappropriate for this court to decide a factual matter without a remand to the trial court. Because I would reach a result different from the majority, I must dissent.

Well established public policy in Washington disfavors contracts in restraint of trade. *See, e.g.,* RCW 19.86.030; *Organon, Inc. v. Hepler,* 23 Wn. App. 432, 436 n.1, 595 P.2d 1314 (1979). This court has repeatedly recognized that covenants not to compete constitute contracts in restraint of trade. *Wood v. May,* 73 Wn.2d 307, 308–09, 438 P.2d 587 (1968); *Racine v. Bender,* 141 Wash. 606, 611, 252 P. 115 (1927). Consequently, we enforce such covenants only to the limited extent that they constitute partial restraints and meet the test of reasonableness. *Sheppard v. Blackstock Lumber Co.,* 85 Wn.2d 929, 931, 540 P.2d 1373 (1975); *Wood,* at 308. To further the public policy disfavoring restraints of trade, we should carefully examine and narrowly construe all covenants not to compete. *See Knight, Vale & Gregory v. McDaniel,* 37 Wn. App. 366, 370, 680 P.2d 448, *review denied,* 101 Wn.2d 1025 (1984).

Essentially, the majority concludes that the challenged covenant "is valid and enforceable" because it "is consistent with *Racine . . .*" Majority, at 697. To the extent that *Racine* recognized that an accounting firm had a legitimate interest in protecting its existing client base, I agree with the majority. However, the validity of the covenant's specific restrictions depends in part upon whether the restrictions "are not greater than are reasonably necessary to protect the business or good will of the employer . . ." *Racine,* at 611. If this court intends to continue adhering to the approach adopted in *Racine* and *Wood,* the reasonableness of each specific restriction must be tested under the particular circumstances of each case as demonstrated by

the evidence presented. *Sheppard,* at 933; *Wood,* at 312.

The majority never discusses the covenant's specific terms. The restrictive covenant in question forbids Ms. Moran for 5 years from servicing any clients who were clients of Perry, Whittemore & Tanner (PWT) during her term of employment. I believe both the scope of the service restriction and its duration to be in conflict with *Racine* and *Wood,* and not reasonably necessary to protect PWT's business or goodwill.

We have found service restrictions reasonable in general, and particularly so in the accounting context, because it would be natural for a client to shift its accounting business from an employer's firm to follow a trusted accountant with whom it has a working relationship and who has valuable knowledge of the client's business and internal operations. *Racine,* at 612–13; *Knight,* at 370. Service restrictions are intended to prevent the employee from gaining unfair advantage from his or her knowledge of, or acquaintance with, the former employer's clients. *Racine,* at 611; *Wood,* at 310. Here, Ms. Moran worked not as a general accountant, but rather in the very specialized PWT Retirement Department, which serviced a limited number of PWT clients. Report of Proceedings vol. II, at 136, 207. Yet, the service restriction extends to all clients serviced by the various PWT departments. Even as to Retirement Department clients, the restriction applies regardless of whether Ms. Moran had gained specific knowledge of the client's accounting needs and regardless of whether she had any contact with the client or a party closely identified with the client. Consequently, despite the majority's unsupported conclusion, the PWT service restriction conflicts with the covenants upheld in *Racine* and *Knight,* both of which were limited to clients with which the employee had come in contact. *Racine,* at 607; *Knight,* at 369. Moreover, the restriction covers clients who terminated their relationship with PWT prior to Ms. Moran's leaving, as well as clients that had taken all of their accounting work to other firms, and later decided to have Ms. Moran handle their retire-

ment plan work. Findings of fact 16, 20, Clerk's Papers, at 5–6.

Based upon these facts, the trial court concluded that the service restriction was greater than that reasonably necessary to protect PWT's business and goodwill. Conclusions of law 5, 6, Clerk's Papers, at 7. I find the trial court's conclusions supported by substantial evidence, and uncontroverted by the majority opinion, which concentrates its analysis solely on the reasonableness of the trial court's modification and the liquidated damages provision.

The majority also failed to consider the reasonableness of the 5–year period during which the service restriction continues to apply. Although the trial court reached no conclusion concerning the service restriction's duration, I would find 5 years unreasonable as a matter of law. *See Wood,* at 311. Presumably, the restriction's duration should reflect the time PWT needs to reestablish a client–accountant relationship, independent from the departing employee. Ms. Moran's term of employment lasted approximately 1 year. Findings of fact 5, 7, Clerk's Papers, at 4. Yet for the covenant to be reasonable, this court must be convinced that PWT needs 5 years to reestablish client trust. Albeit in a different context, we held in *Wood* that a 5–year duration was unreasonable for an employee's covenant not to compete with his employer. Rather than dictating a reasonable time period, I would follow the procedure established in *Wood,* where we remanded for the trial court to determine whether "1 year, 3 years or some other period of time is reasonable under the facts in this case." *Wood,* at 312. I would note in passing that *Racine* and *Knight* approved 3–year covenants, but given that retirement accounting is cyclical, consisting mostly of tax filings, Report of Proceedings vol. III, at 391–96, a 2– or 3–tax–return limit may be more appropriate in this case.

Having found the covenant unreasonable, the trial court modified the restrictive provision so that Ms. Moran would only be restricted from "soliciting or diverting" active clients. Clerk's Papers, at 6, 8. I agree with the majority's

conclusion that while the trial court had authority to modify, the covenant as modified "would not adequately safeguard the employer's interest in retaining its clients." Majority, at 701. When an employee leaves an employer, especially in the accountant context, clients would often choose to follow, not because of solicitation or diversion, but because of the nature of their relationship with, and the confidential knowledge of, the employee. As this court observed in *Racine,* clients do not desire the departing employee's services because he or she is the only person who has the ability to perform them, "but because they know him [or her] well and he [or she] knows all about their business." *Racine,* at 612–13.

I would require the trial court to modify the covenant so that Ms. Moran would be prohibited from servicing clients about whom she had gained confidential information or whom she served previously as a PWT employee. The modified covenant would be subject to two exceptions: (1) clients that affirmatively and independently terminated their relationship with PWT prior to Ms. Moran's leaving; or (2) clients that left after Ms. Moran to have their entire accounting needs serviced by an accountant other than PWT, and subsequently transferred their retirement accounting to Ms. Moran. To address the majority's concern with the fairness of PWT's burden of proof, I would require Ms. Moran to demonstrate that a particular client covered by the covenant comes within one of the exceptions. With these modifications, I believe the covenant can protect PWT's legitimate interest, without imposing undue hardship on Ms. Moran and without injuring the public's interest. *See Racine,* at 611–12; *Knight,* at 369.

Finally, I must also disagree with the majority's treatment of the liquidated damages provision. Under the employment contract, if Ms. Moran serviced clients in violation of the covenant, she would have to pay PWT 50 percent of her billings to the client for 3 years, or a total of 150 percent of the annual fees. Because the trial court ruled immediately after PWT presented its case, Ms. Moran had

no opportunity to present evidence on the reasonableness of the 150 percent requirement and the trial court entered no findings and made no ruling on the issue. Finding of fact 28, Clerk's Papers, at 7. In fact, the trial court precluded Ms. Moran's counsel from exploring the reasonableness of the 150 percent figure during cross examination of PWT witnesses. Report of Proceedings vol. II, at 270–73.

Nevertheless, the majority has concluded that 150 percent of annual fees "is within the range of reasonable agreements for the transfer of the right to service accounts." Majority, at 704–05. I think the majority's conclusion is both inappropriate and inaccurate for several reasons. The majority relies on *Knight* where the court found 105 percent of annual fees reasonable. *Knight,* at 372. However, in *Knight* the parties had litigated the issue. There, the court based its decision on expert opinion in the record, which established 105 percent as a reasonable forecast of harm to the employer and as based on a general formula in the accounting field for purchases of an ongoing practice. *Knight,* at 371–72. By contrast, here the majority relies on a single piece of evidence culled from the record, demonstrating that PWT recently purchased the right to service accounts for 135 percent of annual fees. Majority, at 704. By basing its determination of reasonableness not on objective market information, but on what PWT has paid, the majority works an injustice on Ms. Moran, who has never had the opportunity to litigate the issue.

I also think the 150 percent figure inappropriate because it is based on the amount Ms. Moran bills each year for 3 years, rather than on the amount PWT billed prior to losing its client. As the *Knight* court recognized, the amount of liquidated damages must be "a reasonable forecast of just compensation for the harm that is caused by the breach . . ." *Knight,* at 371. I think it relevant that PWT, in purchasing client accounts from other firms, limits its payments to a percentage of what the seller firm billed the client, rather than a percentage of what PWT bills in the

future. Exhibit 17, Report of Proceedings vol. III, at 407–11.

Because this case concerns a restrictive covenant, I think it also appropriate to ensure that the liquidated damage provision does not impose an undue hardship on the employee. Thus, I agree in principle with the New Hampshire approach enunciated in *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 1313 (1979). However, I also agree with the majority, when it rejects certain specific considerations used by the New Hampshire court, such as the respective incomes and comparative sizes of the parties. Majority, at 705. Instead, I would limit the amount paid by Ms. Moran in any one year to no more than a reasonable percentage of the amount billed by PWT in the last year it serviced the client. In this way, PWT would be compensated for the harm it suffered, while any additional business generated by Ms. Moran's efforts would be protected. As I have indicated, the reasonableness of the 150 percent figure should be left to the trial court to determine after the parties have had a full opportunity to litigate the issue.

In summary, the majority has failed to recognize that the covenant's terms conflict with those approved in *Racine, Wood,* and *Knight.* By also failing to recognize the essentially factual nature of the inquiry required, the majority has acted inconsistently with our approach set down in *Racine* and *Wood.* Moreover, by failing to remand the issue of the liquidated damages provision, the majority does a great injustice both to Ms. Moran and to our adversarial fact–finding procedures. Consequently, I must dissent.

PEARSON, C.J., BRACHTENBACH, J., and SCHUMACHER, J. Pro Tem., concur with UTTER, J.

Reconsideration granted June 9, 1988.