[No. 41597-6-II.   Division Two.   February 28, 2012.]

ROBERT EMERICK, *Respondent*, v. CARDIAC STUDY CENTER, INC., PS, *Appellant*.

*Valarie S. Zeeck* (of *Gordon Thomas Honeywell*), for appellant.

*Stuart C. Morgan*, for respondent.

¶1 ARMSTRONG, J. — When Dr. Robert Emerick joined Cardiac Study Center's specialty practice, he signed a covenant not to compete with Cardiac if he left the practice. Cardiac terminated Emerick, and he filed this action, seeking a declaration that the covenant was unreasonable and thus unenforceable. The trial court agreed and granted Emerick summary judgment, invalidating most of the covenant's provisions. On appeal, Cardiac argues that the trial court misapplied Washington law in granting the summary judgment. We agree and, therefore, reverse and remand.

## FACTS

¶2 Cardiac is a medical practice group of approximately 15 cardiologists. The practice has provided care to patients

with heart disease in Pierce County since 1966. The practice has four offices, each near a hospital. The hospitals serve as a referral source for Cardiac.

¶3 Dr. Robert Emerick practiced medicine in Memphis, Tennessee, for approximately three years before joining Cardiac. In February 2002, Cardiac hired him as an employee. In February 2004, Emerick became a shareholder of Cardiac. At that time, Emerick signed a shareholder employment agreement, which included the covenant not to compete at issue here. The covenant states that if a doctor leaves the group, he promises not to practice competitively in Pierce County or Federal Way for a period of five years. The covenant specifically provides:

> (e) Non-Competition. . . . The Employee further recognizes and acknowledges that because the goodwill of the Corporation's business is a valuable asset, and because the solicitation of patients of referral sources or persons or entities with whom the Corporation contracts, by the Employee, after the Employee has ceased to be employed by the Corporation, will cause irreparable harm to the goodwill of the Corporation, the Corporation would not continue to employ the Employee unless it is assured that such solicitation will not occur. The Employee therefore agrees and covenants that during the Employee's employment by the Corporation and for sixty (60) full months after termination of such employment for any reason, the Employee will not, directly or indirectly, (i) anywhere within Pierce County and Federal Way, Washington ("Restricted Area") engage in the practice of cardiac medicine in any manner which is directly competitive with any aspect of the business of the Corporation as presently conducted or as said business may evolve in the ordinary course of business between the date of this Agreement and the expiration of this covenant not to compete, whether or not using any *Confidential Information,* (ii) anywhere in the Restricted Area, have any business dealings or contracts, except those which demonstrably do not relate to or compete with the business or interests of the Corporation, with any then existing patient, customer or client (or party with whom the Corporation contracts) of the Corporation or any person or firm which has been contacted or

identified by the Corporation as a potential customer or client of the Corporation; or (iii) be an employee, employer, consultant, agent, officer, director, partner, trustee or shareholder of any person or entity that does any of the activities just listed. Provided, however, nothing herein shall preclude a patient from selecting a provider of their choice.

Clerk's Papers (CP) at 19-20.

¶4 During oral argument below, Cardiac conceded that Emerick should be allowed to practice in Federal Way; Cardiac suggested a geographic restriction of a five-mile radius around the existing Cardiac centers. Cardiac also conceded that Emerick should be allowed to see his former patients from Cardiac.

¶5 Emerick specializes in interventional cardiology.[1] He explained that Cardiac has six other interventional cardiologists. Approximately five other interventional cardiologists practice in Pierce County, and three practice in Federal Way. Cardiac submitted evidence that the distinction between interventional cardiologists and noninterventional cardiologists is not critical in determining an appropriate physician-to-population ratio. Further, Cardiac presented evidence that Pierce County and Federal Way have an excess of cardiologists for the population's need.[2]

¶6 In August 2005, patients and other medical providers began to complain to Cardiac about Emerick's conduct (CP at 522 (stricken)).[3] Because of Emerick's conduct, some

---

[1] Interventional cardiology provides patients with a nonsurgical alternative to coronary bypass surgery. Often, patients participating in interventional cardiology, rather than surgical options, will need longer term care and periodic adjustments to treatment.

[2] The studies cited show (1) for every 100,000 persons, there is a need of 2.6 to 4.22 cardiologists; and (2) the Pierce County and Federal Way area has approximately 4.4 cardiologists per 100,000 persons.

[3] Emerick moved to strike Cardiac's declarations setting forth its history with him. The trial court struck as hearsay large portions of Cardiac's declarations explaining why it terminated Emerick. Cardiac does not assign error to this evidentiary ruling, but it indirectly challenges the ruling because it claims the court should have considered the parties' history. Most of the assertions in these

physicians stopped referring patients to Cardiac (CP at 137 (stricken)). Cardiac's Professional Conduct Committee (Committee) met with Emerick to address the complaints (CP at 137 (stricken)). The Committee met again after more complaints were received, yet Emerick's behavior did not change (CP at 137-40 (stricken)). In February 2009, the Committee recommended that the Board discipline Emerick (CP at 147 (stricken)). On July 1, 2009, Cardiac's Board of Directors terminated Emerick (CP at 147 (stricken)).

¶7 Emerick remained a shareholder until September 30, 2009.

PROCEDURE

¶8 Emerick sued Cardiac, seeking a declaration that the covenant was unenforceable. Emerick moved for summary judgment, arguing that the covenant was void as against public policy.[4] In March 2010, the trial court granted Emerick's motion, ruling that the covenant was unenforceable because it violated public policy. Although the trial court's ruling appeared to void the covenant in its entirety, the court also ordered Emerick not to solicit Cardiac patients. And the court ordered the parties to remedy the effects of a letter Cardiac sent to patients regarding Emerick leaving the practice. Then, on December 3, 2010, the trial court entered findings of fact and conclusions of law, concluding in part that the covenant's temporal scope was "overly broad." CP at 1389. The court permanently enjoined Cardiac from enforcing the covenant, which "bar[s] Dr. Emerick from serving patients whom Dr. Emerick does

---

declarations do not appear to be hearsay ("a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). ER 801(c). Rather, the statements simply document the complaints Cardiac received about Emerick and Cardiac's responses to the complaints. Accordingly, we report the history for the same purpose, noting the parts the trial court struck. The truthfulness of the complaints is not an issue in our resolution of the case.

[4] Cardiac also moved for summary judgment.

not solicit, and has not solicited." CP at 1390. The trial court awarded Emerick fees and costs totaling approximately $60,000.

## ANALYSIS

### I. STANDARD OF REVIEW

¶9 We review summary judgment de novo. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92-93, 993 P.2d 259 (2000). Whether a covenant not to compete is reasonable is a question of law. *See Alexander & Alexander, Inc. v. Wohlman*, 19 Wn. App. 670, 684, 578 P.2d 530 (1978).

### II. NONCOMPETITION PROVISION

¶10 Courts will enforce a covenant not to compete if it is reasonable and lawful. *Wood v. May*, 73 Wn.2d 307, 312, 438 P.2d 587 (1968). We test reasonableness by asking (1) whether the restraint is necessary to protect the employer's business or goodwill, (2) whether it imposes on the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether enforcing the covenant would injure the public through loss of the employee's service and skill to the extent that the court should not enforce the covenant, i.e., whether it violates public policy. *Perry v. Moran*, 109 Wn.2d 691, 698, 748 P.2d 224 (1987), *judgment modified on recons.*, 111 Wn.2d 885, 766 P.2d 1096 (1989).

¶11 If the trial court determines that certain terms of the covenant are unreasonable, the entire covenant does not fail. *Wood*, 73 Wn.2d at 312. The court should still seek to enforce the covenant to the extent reasonably possible to accomplish the contract's purpose. *Wood*, 73 Wn.2d at 312-13. Specifically, the court considers "whether partial enforcement is possible without injury to the public and without injustice to the parties." *Wood*, 73 Wn.2d at 313 (distinguishing Washington law from the so called "blue-

pencil test," which requires the changes to the contract to still be grammatically viable).

## A. Necessary for Employer

■■ ¶12 A restrictive covenant protects an employer's business as warranted by the nature of employment. *Wood*, 73 Wn.2d at 310 (quoting Annotation, *Validity and Enforceability of Restrictive Covenants in Contracts of Employment*, 9 A.L.R. 1456, 1467-68 (1920)). An employee who joins an established business gains access to his employer's customers and " 'acquire[s] valuable information as to the nature and character of the business. . . . ' " *Wood*, 73 Wn.2d at 310 (quoting 9 A.L.R. at 1467-68). This exposure to the employer's clients and business model allows the employee to compete with his employer after he leaves the employment. *Wood*, 73 Wn.2d at 310 (quoting 9 A.L.R. at 1467-68). To protect the employer's business, equity allows the employer to require the employee to sign a noncompetition agreement. *Wood*, 73 Wn.2d at 310.

¶13 Specifically, an employer has a "legitimate interest in protecting its existing client base" and in prohibiting the employee from taking its clients. *Perry*, 109 Wn.2d at 700. In *Perry*, our Supreme Court considered an accounting firm's restrictive covenant with a newly hired accountant. *Perry*, 109 Wn.2d at 692. Moran, the new accountant, had worked as an accountant for a significant period of time before joining the firm. *Perry*, 109 Wn.2d at 692. The court recognized the firm's legitimate interest in protecting its client base after Moran left. *Perry*, 109 Wn.2d at 700; *see also Knight, Vale & Gregory v. McDaniel*, 37 Wn. App. 366, 369-70, 680 P.2d 448 (1984) (recognizing a firm's interest in maintaining a client base built over many years). Courts also consider an employer's investment in training a newly minted professional. *See Ashley v. Lance*, 75 Wn.2d 471, 475-77, 451 P.2d 916 (1969) (" 'A young professional man may be willing to trade his future right to compete in a given community for an immediate and lucrative share in

an established practice.'" (quoting *McCallum v. Asbury*, 238 Or. 257, 393 P.2d 774, 777 (1964))), *aff'd on other grounds by Ashley v. Lance*, 80 Wn.2d 274, 493 P.2d 1242 (1972); *Wood*, 73 Wn.2d at 310-11 (discussing the substantial investment the master horseshoer made in training the apprentice).

¶14 When the trial court made its oral ruling, it did not discuss Cardiac's protected interest in its client base or its investment in Emerick. In its subsequent written conclusions of law, however, the trial court found that Cardiac was entitled to "minimal" protection under the covenant because Cardiac did not teach Emerick his skills and knowledge. CP at 1388. Similar to *Perry*, where Moran was already trained as an accountant, Emerick was a trained cardiologist before he joined Cardiac. But the trial court's focus on Emerick's medical training in analyzing Cardiac's protected interest was too narrow. Cardiac provided Emerick with an immediate client base and established referral sources when he moved to the area. Moreover, Emerick had access to Cardiac's business model and goodwill. These are all protectable business interests that the trial court should have considered in assessing the covenant's enforceability.

B. Scope of Restraint

¶15 The second reasonableness factor focuses on the extent to which the covenant adversely affects the employee's ability to earn a living. *See McDaniel*, 37 Wn. App. at 370 (a court carefully considers a restrictive covenant because of a concern about freedom of employment). Generally, a court determines the reasonableness of a covenant by analyzing its geographic and temporal restrictions. *See Wood*, 73 Wn.2d at 311-12.

¶16 Having determined that Cardiac had only minimal interests to protect, the trial court concluded without explanation that the covenant's temporal scope was too broad and that the six months Emerick had not practiced was

"ample time" to protect Cardiac's financial interests and allow it to hire a replacement. CP at 1389. The trial court's discussion of the geographic restriction was equally brief, concluding that "[the covenant] would bar Dr. Emerick from practicing in countless cities throughout Pierce County and in Federal Way, where Dr. Emerick never worked as a [Cardiac] doctor; and it would bar Dr. Emerick from practicing cardiac medicine." CP at 1388-89.

¶17 The trial court's analysis of the scope of the covenant is flawed for several reasons. As we stated, the court erred in determining that Cardiac had only minimal interests to protect. And this error allowed the court to dispose of the scope analysis without balancing Cardiac's actual protectable business interest against the time and geographic restrictions on Emerick's ability to earn a living. Moreover, the court made no attempt to save as much of the covenant as could reasonably and fairly be enforced. *Wood*, 73 Wn.2d at 314 (explaining that a covenant should be enforced to the extent it is reasonable).

## C. Public Policy

¶18 Finally, public policy requires a court to consider possible harm to the public from enforcing the covenant. *McDaniel*, 37 Wn. App. at 369. Such harm may include restraint of trade, limits on employment opportunities, and denial of public access to necessary services. *Organon, Inc. v. Hepler*, 23 Wn. App. 432, 436 n.1, 595 P.2d 1314 (1979); *McDaniel*, 37 Wn. App. at 370. But the court must still balance these concerns against the employer's right to protect his business. *Wood*, 73 Wn.2d at 310; *see generally Perry*, 109 Wn.2d at 700 ("A bargain by an employee not to compete with the employer . . . is valid."); *Organon, Inc.*, 23 Wn. App. at 436 n.1 ("[A]n employer should certainly have the right . . . to condition employment on the employee's promise to refrain from certain activities.").

¶19 In its oral ruling, the trial court explained its public policy analysis: "I don't think it's fair . . . or just to prevent

[Emerick] from practicing medicine and the skills that have took [sic] him so long to acquire . . . . I'm not going to enforce the non-compete agreement." Report of Proceedings (Mar. 5, 2010) at 23. The court's conclusions of law are similarly broad: "[a] non-competition agreement that professes to bar a specialized physician from providing care to unsolicited patients has public policy implications" and, in enforcing a covenant, "the Court has considered the fairness to the public." CP at 1389. But the court failed to apply these concepts specifically to the covenant at issue by addressing, for example, the risk that patients in the geographic area would be denied access to physicians practicing in Emerick's specialty.[5] Nor did the court attempt to balance these concerns against Cardiac's protectable business interest. *Perry*, 109 Wn.2d at 698.

¶20 Emerick argues, in effect, that such balancing is unnecessary, citing cases from other jurisdictions that have either declined to enforce or have strictly construed restrictive covenants between physicians because of the significant and personal relationship that exists in a doctor-patient setting. *Ohio Urology, Inc. v. Poll*, 72 Ohio App. 3d 446, 594 N.E.2d 1027 (1991); *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277 (1999); *Intermountain Eye & Laser Ctrs., PLLC v. Miller*, 142 Idaho 218, 127 P.3d 121 (2005). Some states have legislatively precluded restrictive covenants in a medical setting. *See* Colo. Rev. Stat. § 8-2-113(3); Del. Code Ann. tit. 6, § 2707; Mass. Gen. Laws ch. 112, § 12X. Emerick also cites an American Medical Association opinion discouraging restrictive covenants in the medical profession because they interfere with continuity of care. Council on Ethical & Judicial Affairs, Am. Med. Ass'n, Code of Medical Ethics Opinion 9.02 (2004-2005 ed.) (Restrictive Covenants and the Practice of Medicine, updated June 1998).

---

[5] As stated, Cardiac submitted evidence that the geographic area it served has an excess of cardiologists.

¶21 But Washington courts have not yet held that restrictive covenants between physicians are unenforceable. In *Ashley*, our Supreme Court considered a covenant among physicians where four of the five partners in a medical group decided to dissolve the partnership and open a competing clinic 300 feet from the original clinic. *Ashley*, 75 Wn.2d at 473. The court explained that restrictive covenants are common among professionals because they allow a new professional to step into an already established practice while protecting the employer from future competition. *Ashley*, 75 Wn.2d at 476 (quoting *McCallum*, 393 P.2d at 777). Thus, to the extent the trial court relied on authority from other jurisdictions, it erred in invalidating the covenant on public policy grounds.

¶22 In conclusion, the trial court erred in evaluating Cardiac's protectable business interest. In part, due to this initial error, the court failed to properly analyze the scope and public policy factors included in the test for enforceability, and the court failed to address whether the covenant could be saved to some extent.

¶23 We reverse the order granting summary judgment, vacate the attorney fees award to Emerick, and remand for further proceedings. We also award Cardiac its statutory attorney fees.

¶24 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

HUNT and JOHANSON, JJ., concur.

Review denied at 175 Wn.2d 1028 (2012).