**PACIFIC AEROSPACE & ELECTRONICS, INC., a Washington corporation, Plaintiff,**

v.

**Edward TAYLOR, an individual; Kristen Taylor, an individual; James Petri, an individual; RAAD Technologies, Inc., a Washington corporation; Defendants.**

No. CS–02–412–AAM.

United States District Court, E.D. Washington.

Oct. 10, 2003.

Harry J.F. Korrell and Douglas J. Morrill of Davis Wright Tremaine LLP, Seattle, WA, for plaintiff.

John W. Beuhler, Jr., Wenatchee, WA, for defendants.

Janyce L. Fink, Esq., Seattle, WA, for defendants.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

MCDONALD, Senior District Judge.

**BEFORE THE COURT** is plaintiff's Motion for Partial Summary Judgment (Ct.Rec.98). The motion was heard with oral argument on September 30, 2003. Harry J. Korrell, Esq., appeared for plaintiff. John W. Beuhler, Jr., Esq., appeared for defendants.

## I. BACKGROUND

Plaintiff Pacific Aerospace & Electronics, Inc. (PAE), manufactures hermetically-sealed connectors and housings for its customers' highly sensitive electronic circuitry in the commercial and military aerospace, space exploration, defense electronics and weapons systems, medical implants, communications, and geotechnology industries. Defendants Edward Taylor and James Petri are former employees of PAE who left PAE in August 2002 to form a competing concern, defendant RAAD Technologies, Inc. (RAAD). Edward Taylor was employed at PAE as Vice President for Engineering and Technology from July 1, 1991 to August 22, 2002. Petri was employed by PAE as the Engineering Manager from June 13, 1994 to August 22, 2002.

Plaintiff's complaint alleges claims against defendants for violation of the federal Computer Fraud and Abuse Act, breach of contract, breach of common law duties of confidentiality and loyalty, breach of common law duties regarding ownership of inventions, tortious interference with contracts and business relationships, unfair competition, misappropriation of trade secrets, civil conspiracy, and conversion.[1]

Essentially, plaintiff contends Taylor and Petri have stolen plaintiff's business ideas and customers to the detriment of PAE and to the benefit of RAAD.

Plaintiff now moves for summary judgment on the following claims: (1) for breach of contract against Edward Taylor with respect to the confidentiality and non-solicitation provisions of his employment agreement with PAE; (2) for breach of contract against Petri with respect to his confidentiality agreement with PAE; and (3) for breach of common law duties of loyalty and confidentiality against both Taylor and Petri. Plaintiff asks the court to permanently enjoin Taylor and Petri from any further disclosure or use of PAE's confidential information for themselves or on behalf of any other entity; permanently enjoin Taylor, Petri and RAAD from any further contact with PAE customers until June 2005; and order an accounting and impose a constructive trust upon any profits realized by RAAD as a result of Taylor's and Petri's unlawful conduct.

## II. FACTS[2]

While employed at PAE, Taylor and Petri were required to sign an Invention and Confidential Information Agreement. Petri signed the agreement in 1994 and 1996. Taylor signed the agreement in 1994. The agreement states:

> All Confidential Information that I observe, conceive or develop, either alone or with others, during the term of the Agreement shall be the exclusive property of the company. I will preserve in confidence and will not disclose or use, either during or after the term of the Agreement, any Confidential Informa-

---

**1.** The court has entered an order granting plaintiff's motion for leave to file an amended complaint to add a claim for patent infringement.

**2.** These are undisputed facts gleaned from a comparison of plaintiff's statement of facts and defendants' "Amended LR 56.1 Statement of Facts."

tion known to me as a result of my relationship with the Company, whether or not conceived of or developed by me, except as required in my performance of services for the Company.

"Confidential Information" is defined in the agreement as:

... all plans, trade secrets, data, know-how, processes, techniques, specifications, drawings, instructions, research, formulae, applications, test procedures and results, chemical and ceramic formulations, compositions and products, equipment, identity and description of records, **customer lists,** supplier identity, marketing and sales plans, forecasts, computer data, financial information, costs, data, pricing information and all other information, concepts or ideas involving or reasonably related to the business or prospective business of the Company **and not generally available to the public,** or information received by the Company that the Company has a bona fide obligation, contractual or otherwise, not to disclose.

(Emphasis added).

In 1997, Taylor signed a separate employment agreement that was renewed in 2000. This agreement, which provided Taylor with employment for a specific period of time (initially, three years), provides:

*5.1.1 Covenant:* Either during or after expiration of the Contract Term, the Employee shall not, directly or indirectly, divulge, furnish or make accessible to any person, firm, corporation, association or other entity, or use in any manner, any Protected Information (as defined below), or cause any Protected Information to enter the public domain, except as may be required in the regular course of the Employee's employment by the Company.

"Protected Information" is defined in Section 5.1.5 as:

... trade secrets, **confidential and proprietary business information of the company ... including but not limited to, customer lists (including potential customers),** sources of supply, processes, patented or proprietary technologies, plans, materials, pricing information, internal memoranda, marketing plans, internal policies, and products and services which may be developed from time to time by the Company and its agents or employees.

(Emphasis added).

Pursuant to Section 5.1.4 of the agreement, Taylor agreed that "[a]ll forms of information and all physical property made or compiled by the Employee prior to or during the Contract Term containing or relating in any way to Protected Information shall be the Company's exclusive property."

This agreement also imposed restrictions on Taylor's post-employment conduct, in particular his ability to solicit PAE customers:

*Section 5.2:* The employee agrees that during the Contract Term and for a period of two years after expiration of the Contract Term ... he will not ... (iii) have any contact, directly or indirectly, with any customers of the Company.

The parties' 2000 renewal of the agreement extended the Contract Term through May 31, 2002 (a period of two years). Therefore, the obligation not to contact any customers of PAE expires May 31, 2004, unless Taylor was terminated without cause. In that case, pursuant to Section 6.3 of the agreement, the prohibition extended only six months from the expiration of the contract term or until November 30, 2002. The agreement also provides that in the event Taylor breaches his confidentiality or non-solicitation provisions, the "restricted period" shall be ex-

tended by the period of such violation. (Section 5.4.1). As part of the agreement, Taylor acknowledged that violations of the agreement would entitle PAE to "an injunction ... restraining the Employee from committing or continuing any violation of such sections of this Agreement." (Section 5.4.2).

On August 22, 2002, Taylor's and Petri's employment at PAE ceased. PAE notified both of them of their contractual and common law obligations with respect to PAE's confidential information and also notified Taylor about the non-solicitation provision in his employment agreement. This notification occurred during a meeting with PAE officials on August 22, 2002, in writing from PAE on August 30, and a third time in a meeting on November 8, 2002.

After their employment at PAE ceased, Taylor and Petri compiled for RAAD a list of prospective customers, projects and history. The list was derived from their memories of information developed by or available to them at PAE and included customer contacts, information about active projects and engineers, and customers' business and design preferences. Information they could not recall, including telephone numbers and addresses, was obtained from a business card file which Taylor took with him from PAE.

In preparation for a sales trip to southern California, Taylor and Petri prepared a memorandum summarizing their recollections of particular PAE customers' engineers and their histories and attitudes about PAE. This information was given to RAAD sales representative Mark Kline for use in soliciting business for RAAD. Because of this information, RAAD was able to negotiate a lower commission structure with Kline.

Taylor and Petri used customer information they took from PAE to contact and solicit business from PAE customers. Furthermore, Taylor has personally met PAE customers within the last year, including Northrop Grumman Maryland (also referred to as Northrop Grumman Baltimore), Raytheon El Segundo, Lockheed Martin Santa Barbara (aka Santa Barbara Focal Plane), and Superconductor Technologies (also referred to as Superconducting Technologies). Petri accompanied and assisted Taylor with these solicitations.

## III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## IV. DISCUSSION

### A. PAE Customer Information

Defendants Taylor and Petri do not dispute they have used customer information obtained while they were employed by PAE, but they assert it is not confidential and therefore, not a breach of their employment contracts with PAE and their common law duties of loyalty and confidentiality.

Citing *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 971 P.2d 936 (1999), defendants contend analysis under the Washington Uniform Trade Secrets Act (UTSA), RCW 19.108, is appropriate to determine whether a customer list constitutes protected information.[3] In *Nowogroski*, the trial court ruled the UTSA had displaced various other common law actions and common law cases, although the Washington Supreme Court did not address that issue on discretionary review because it was not presented to the court. 137 Wash.2d at 434 and 436, 971 P.2d 936. The supreme court did review whether an employer's customer list constituted a protected trade secret such that it could be misappropriated by a former employee. Under the UTSA, RCW 19.108.010(4),

" '[t]rade secret' means information, including a ... compilation ... that:

(a) Derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

 In *Nowogroski*, the trial court found that a customer list was a trade secret because it derived independent economic value from not being known and had been subject to reasonable efforts to keep it secret. *Id.* at 436, 971 P.2d 936. The state supreme court acknowledged that a customer list is one of the types of information which can be a protected trade secret if it meets the criteria of the UTSA. *Id.* at 440, 971 P.2d 936. Trade secret protection, however, will not generally attach to customer lists where the information is readily ascertainable. Thus, if information is readily ascertainable from public sources such as trade directories or phone books, then customer lists will not be considered a trade secret "and a prior employee, not subject to a non-competition agreement, would be free to solicit business after leaving employment." *Id.* at 441, 971 P.2d 936.[4] Whether a customer list is protected as a trade secret depends on three factual inquiries: 1) whether the list is a compilation of information; 2) whether it is valuable because unknown to others; and 3) whether the owner has made reasonable attempts to keep the information secret. *Id.* at 442, 971 P.2d 936. The specific holding of the state supreme

---

**3.** Misappropriation of trade secrets is a separate cause of action stated in plaintiff's complaint, but not one on which plaintiff is specifically seeking summary judgment as part of the instant motion.

**4.** Edward Taylor was subject to a non-competition agreement as discussed *infra*.

court in *Nowogroski* was that even customer information which is simply committed to the memory of a former employee can be a trade secret which is subject to misappropriation. *Id.* at 449–50, 971 P.2d 936.

■ Although defendants apparently maintain that PAE's causes of action for breach of contract and breach of common law duties of confidentiality and loyalty are superseded by the UTSA, that is not the case. Indeed in *Nowogroski,* the state supreme court, citing its previous decision in *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 48, 738 P.2d 665 (1987), observed in a footnote that:

> The existence of a contract protecting trade secrets does not preclude a separate cause of action in tort under the provisions defining trade secrets. The terms of a contract may be relevant to such issues as the existence of a protectable trade secret or the creation of a duty of confidence.

137 Wash.2d at 437, n. 2, 971 P.2d 936.

In *Boeing,* the plaintiff, Boeing, alleged breach of contract, breach of confidential relationship, conversion **and** misappropriation of trade secrets in violation of the UTSA. The jury found the defendant, Sierracin, had breached a contractual and confidential relationship with Boeing, and had misappropriated Boeing trade secrets. Defendant argued to the state supreme court that the trial court had erred by not consolidating all of these claims into one for misappropriation under the UTSA.

The supreme court rejected this argument, noting that RCW 19.108.900 of the UTSA specifically provides, in part:

(1) This chapter displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret.

(2) This chapter does not affect:

(a) Contractual or other civil liability or relief that is not based on misappropriation of a trade secret . . .

108 Wash.2d at 48, 738 P.2d 665.

The state supreme court also observed that the U.S. Supreme Court has held that proof of trade secrets is not required for breach of confidentiality claims, which may be brought independently of trade secrets claims. *Id.,* citing *E.I. Du Pont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917). A confidential relationship alone is enough to prohibit disclosure. *Id.,* citing *Island Air, Inc. v. LaBar,* 18 Wash.App. 129, 138–39, 566 P.2d 972 (1977).

The state supreme court added that a contractual provision designed to protect against disclosure would also not be subject to displacement by the UTSA, pointing out that the committee which had considered the UTSA had specifically concluded the UTSA should be limited to tort liability and not be extended to cover contract liability. *Id.*

■ PAE can assert claims for breach of contract and breach of common law duties of confidentiality and loyalty, and these claims are independent of its trade secrets claim. Nevertheless, there is some obvious degree of overlap between all of these claims and specifically that pertains to the purported "confidentiality" of plaintiff's customer information. Defendants assert it is not confidential information because it could have been acquired by them through independent means such as internet sources, trade publications, telephone directories and public libraries. Defendants' proof consists of, among other things, declarations of Taylor and Petri filed previously in opposition to plaintiff's motions for preliminary injunction and for an order to show cause. (Exs. 9, 10 and 12 to Supplemental Declaration of John W.

Beuhler, Jr., In Opposition To Plaintiff's Motion for Summary Judgment).

In his declaration filed in opposition to plaintiff's motion for contempt, Taylor asserts:

It is a misrepresentation to allege that PAE possesses a customer list that is unique and different than any other hermetic connector company's list. Although it is possible that occasionally a company may have a secret customer, this is the exception and certainly not the rule. I have not seen one customer in PAE's complaints that could be characterized as 'secret.' In fact the only companies PAE complains about are the big well known companies that represent a significant portion of their business and every one of these companies can be found on all of the dozens of hermetic connector companies['] customer lists.

In his declaration filed in opposition to plaintiff's motion for preliminary injunction, Taylor says: 1) at least 40% of the employees at PAE have access to the customer list; 2) PAE's customers, projects, and pricing are routinely publicized by PAE; 3) and information about the specific individuals to contact about a particular program is available from the web.

In his declaration filed in opposition to PAE's motion for preliminary injunction, Petri attached "information [he] obtained from companies who have paid [PAE] for drawings of their product and they now distribute said drawings to the general public." Petri explains that Ex. 2 to his declaration is a "customer supplied source control drawing that depicts engineer names and a list of qualified sources for the product." He also refers to an Ex. 3 which is supposed to be "documents verify[ing] that all of what [PAE] claims is proprietary about its customer list is readily ascertainable via the Internet and various trade publications." (Emphasis in original). There is, however, no Ex. 3 attached to the copy of Petri's declaration which the court has in its possession and furthermore, Petri does not explain how these documents verify that all of what PAE claims is proprietary about its customer list is ascertainable via public sources.

At his deposition, Petri was asked where a person could go to compile a list like the one he gave to Mark Kline, RAAD's sales representative. He was also asked whether there were resources one could use to look up the names of engineers. His response:

Yes. You could go to the Internet and look at any one of these ... customers, Lockheed–Martin, Raytheon, they're in there, and they list their projects that they have won awards for. And at that point, you could call their line and you could ask for project managers on specific projects. You could—you know, and eventually get to the point where you're talking to engineers.

(Petri Dep. at pp. 61–62; Ex. 2 to Morrill Declaration Re Attachments To Motion For Partial Summary Judgment). Asked how long it would take, Petri responded that it depended on how much effort one was willing to put into it and how much time one was willing to spend. He acknowledged "[i]t would take some time." Another way of going about finding the information, according to Petri, is to hire sales representatives, although he conceded a representative's job is made easier if he is provided with a list of the engineers and the projects worked on. (*Id.*).

Defendants also rely on a declaration of Jan Orazem which was submitted by them in opposition to plaintiff's motion for preliminary injunction. (Ex. 1 to Declaration of John W. Beuhler, Jr., In Opposition To Plaintiff's Motion For Summary Judgment). Orazem is the owner of Advanced

Connection Systems, Inc., which is in the business of representing various technical manufacturing companies. He claims to have more than 25 years experience in the world of interconnect, bonding and sealing. According to Orazem, "through a variety of readily ascertainable and accessible sources most, if not all, of PAE's customers can be discovered in a short period." In his declaration, Orazem describes how using PAE's own web site he was able to ascertain PAE customers and from there, using public sources, determine the identity of the customer's engineer and purchasing agent for certain PAE applications. Orazem concludes that "[w]ith a niche technology, defined markets and the ease of obtaining information via the Internet, it doesn't surprise [him] a bit that multiple telephone calls would be coming to the same engineers."

The assertions of Taylor and Petri about PAE customer information being publicly available are conclusory and focus on general information about the customers and their projects which is more likely to be publicly available. PAE's concern is defendants' use of more specific information pertaining to particular engineer contacts within companies and particular customer needs regarding hermetically sealed electrical connectors. Defendants' use of such information is best exemplified by an attachment to an e-mail from Petri to Kline entitled "California Contacts." (Ex. 18 to Morrill Declaration) which identifies contacts for various companies and tidbits about those companies such as: "[Advanced Bionics Corporation] require[s] hermetic seals in titanium, usually with platinum/irridium pins;" [Indigo Systems] love[s] the performance from the PAE products, but hate[s] the prices. Start by calling on Vu Nguyen, (pronounced Voo Win) [Sr. Mechanical Engineer];" "[Gene Findley, Chief Scientist with L3 Communications] would be a great advocate if you can butter him up. If he thinks you are in his fan club you are in good shape. If you don't kiss his ass he will make sure you do not get business. He was forced to use PAE connectors when PAE bought Balo and discontinued the Balo connectors he was using. Boy did this piss him off;" Santa Barbara Focal Plane's "[c]urrent project is a flange with a PAE Jr–D welded into the flange. Let them know we are developing a connector similar to the Jr–D with a dia .012 pin .... Mention my name to Elna [SaitoDesign Engineer], I've worked with her on PAE projects."

Petri was asked whether he believed that compiling a list of customers, contact people and existing PAE projects for RAAD was consistent with his obligations under his employment agreement with PAE. He responded "No." Asked what part of the agreement he violated, Petri stated:

Well, I—if—the only thing I may have violated would be the fact that I knew about the specific names and used them after leaving PAE ....

(Petri Dep. at pp. 88–89).

The court agrees with PAE that the value of this information is evident because of the fact that Mark Kline, RAAD's sales representative, was willing to take a 5% commission on sales instead of an 8% commission because Petri had "provided most of the leads that get me to the key people involved in the decision-making." (Kline Dep. at pp. 89–90; Ex. 19 to Morrill Declaration). Asked whether information he had received from Petri and Taylor about particular companies and contacts within those companies would be publicly available, Kline was largely uncertain, admitted obtaining some of the information might require some work, and that even if some of the information was publicly available, it might not be available in the same detail as Petri and Taylor had relayed it to him. (Kline Dep. at pp. 139–147).

The Orazem declaration does not convince the court there is a genuine issue of material fact whether Taylor and Petri used confidential customer information contrary to their contractual and common law obligations. For example, Orazem claims that by accessing the PAE website he was able to ascertain that Advanced Bionics Corporation was a customer of PAE with regard to Advanced Bionics' Clarion cochlear implant. Orazem says he then accessed the web page for Advance Bionics "which contained all of the information necessary to contact their relevant sales and technical people." This very general information should be compared to the very specific customer information contained in the aforementioned "California Contacts" memorandum that not only is "ABC [Advanced Bionics Corporation] . . . producing a cochlear implant device which is in production," but that [ABC] require[s] hermetic seals in titanium, usually with platinum/iridium pins." Furthermore, the "California Contacts" memorandum identifies the relevant contact person at ABC as Bob Hodge, Director of Manufacturing Engineering, and provides a phone number and e-mail address for him.

It is apparent from the language in the employment agreements that PAE was deeply concerned about employees using confidential and valuable customer information when they left the employ of PAE. Accordingly, PAE went to great lengths to protect such information. In signing the agreements, Taylor and Petri also recognized that at least some PAE customer information had the potential for being confidential. And in his 1997 agreement, renewed in 2000, Taylor specifically acknowledged that a violation of the confidentiality provision would cause irreparable injury to PAE and therefore consented to issuance of an injunction restraining him from committing or continuing any such violation. (Sections 5.1.2 and 5.4.2).

The court finds it interesting that defendants have now been represented by three different counsel in this case. Defendants' counsel at oral argument on plaintiff's motion for partial summary judgment is different from the counsel which represented defendants at oral argument on plaintiff's motion for preliminary injunction. On both occasions of oral argument, counsel for defendants were asked what language they would have included in the employment agreements to more definitely cover the conduct in question (use of confidential customer information). Neither counsel could offer a sage suggestion.

In the end, if it is as easy as Taylor and Petri assert to compile all of the PAE customer information at issue by using public sources, one has to ask why they did not try to do it that way. The fact they did not, and then could not when faced with this litigation, compels this court to conclude as a matter of law they have breached their contractual and common law obligations of confidentiality to PAE.

## B. Solicitation of PAE Customers

Edward Taylor does not deny that he has directly solicited at least some PAE customers for RAAD since his departure from PAE. Furthermore, defendants do not deny that Petri and Kline have solicited some PAE customers on behalf of RAAD since August 22, 2002. Taylor asserts, however, that: 1) that the non-solicitation provision in his employment agreement constitutes an unreasonable restraint of trade and therefore, violates public policy in the State of Washington; and 2) even if it does not, it was only effective until November 30, 2002 because his employment at PAE was terminated without cause.

Taylor contends the non-solicitation provision in his 1997 employment agreement, renewed in 2000, is an unreasonable

restraint of trade because even if RAAD developed a completely different technology than that developed by PAE and sold it to PAE customers, he would still be in violation of the non-solicitation provision. Furthermore, Taylor contends the non-solicitation provision should not be enforced because it deprives the public of his service and skill which is valuable to the public interest.

RCW 19.86.030 declares that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is . . . unlawful." An employee's covenant not to solicit an employer's clients is a type of covenant not to compete. Reasonable covenants not to compete are enforceable. *Perry v. Moran*, 109 Wash.2d 691, 698–99, 748 P.2d 224 (1987). The reasonableness of a covenant not to compete is determined by the court as a matter of law. *Id.* Whether a covenant not to compete is reasonable is determined using a three-part test: 1) whether restraint is necessary for the protection of the business or goodwill of the employer; 2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill; and 3) whether the degree of injury to the public is such loss of the service and skill of the employee to warrant nonenforcement of the covenant. *Knight, Vale & Gregory v. McDaniel*, 37 Wash.App. 366, 369, 680 P.2d 448 (1984). If a restriction is not greater than reasonably necessary to protect the employer's business or goodwill, it will be upheld even if it restrains the employee of his liberty to engage in a certain occupation or business and deprives the public of the services, or restrains trade. *Perry*, 109 Wash.2d at 698, 748 P.2d 224, citing *Racine v. Bender*, 141 Wash. 606, 610–11, 252 P. 115 (1927).

In its June 20, 2003 preliminary injunction order at p. ——, 2003 WL 23100804 at *14, this court stated that "if RAAD were to develop a completely different technology and sell it to PAE customers by using Taylor's and Petri's own talents and experience and not misappropriated trade secrets, this would be fair competition." Indeed, it would likely be "fair competition," **unless Taylor directly or indirectly solicited the customers during the restrictive period of a reasonable and lawful non-competition clause.** Restraint has been held necessary to protect a business from the unfair advantage a former employee may have because of personal contact with the employer's customers resulting in the acquisition of information "as to the nature and character of the business and the names and requirements of the patrons or customers" during his employment. *Copier Specialists v. Gillen*, 76 Wash.App. 771, 774, 887 P.2d 919 (1995). PAE has a legitimate interest in protecting its customer base from depletion by a former employee. It also has a justifiable expectation that by providing employment to Taylor, he would not take away their customers, at least not for a reasonable period of time and not by use of confidential information pertinent to those customers. An employee's covenant not to solicit his employer's customers for a reasonable time is a fair method for protecting the employer's customer base. Such a covenant encourages employment of individuals like Taylor, who was employed at PAE for approximately 11 years, while discouraging the taking of the employer's customers without preventing the employee from engaging in the profession. *See Perry*, 109 Wash.2d at 700, 748 P.2d 224. Defendants have not presented any evidence that the non-solicitation covenant wholly prevents Taylor from engaging in his profession for himself, for RAAD, or any other entity.

In the *Knight* case, at issue was a provision which prevented accountants employed by an accounting firm (Knight, Vale

& Gregory or "KVG") from soliciting or doing work for customers of the accounting firm for a three year period after the accountants left the employment of the firm. The Washington Court of Appeals held this was reasonable. First, the court found the accounting firm had a "legitimate business interest in maintaining the large and profitable clientele acquired over the years." 37 Wash.App. at 369–70, 680 P.2d 448. According to the court:

> This interest is enhanced in the sphere of public accounting because the nature of the accountant-client relationship is such that employees of such a firm gain extensive, valuable knowledge of the clients' business and internal operations and develop a close, familiar working relationship with the client. This experience enables them to be exceptionally competitive with the firm should they choose to leave and offer the same services on their own.

*Id.* at 370, 680 P.2d 448. This same rationale clearly applies to Taylor.

The *Knight* court also found the covenant not to compete, to the extent it prohibited performing accounting services for customers of the accounting firm for three years, was reasonable and lawful. It did not unduly restrain freedom of employment because accountants who had worked for the firm were not precluded from practicing in Tacoma, were free to compete for clients served by anyone other than KVG, and were not precluded from engaging in other branches of accounting work. Furthermore, the advanced training and experience of an accountant who had worked at KVG would presumably allow him or her to attract clients other than by former connections alone. *Id.* Likewise, Taylor is not precluded from setting up shop in Wenatchee where PAE is located, and during the restrictive period he is free to compete for clients served by anyone other than PAE. He has enough experience that he does not need to rely solely on his former connections to PAE in order to attract business. While the market for hermetically sealed electrical connectors may be small, as noted above, there is no evidence that the non-solicitation provision effectively precludes Taylor from any and all employment.

In *Knight,* the court also found KVG clients, as members of the public, were not unduly injured by the restraint because there was no evidence they had been deprived of competent accounting services and they could have chosen either to stay with KVG or employ other firms until the term of the covenant expired. The court found that although the defendants (accountants who had left KVG) might be exceptionally skilled, the service they offered was neither unique nor incomparable. *Id.* at 370–71, 680 P.2d 448.

Taylor contends the service he and RAAD offer is "unique" and "incomparable" and this court recognized as much in its preliminary injunction order. Because of the public interest in certain projects, this court did not enjoin defendants from soliciting "active customers" of RAAD who had also been customers of PAE within the 12 months preceding Taylor's departure from PAE on August 22, 2002. According to this court:

> PAE's (and allegedly RAAD's) connectors and housings are used on projects of important public interest: the Space Shuttle, the Hubble Telescope, the International Space Shuttle, the Longbow Hellfire Modular Missile System used in conjunction with the Apache Helicopter, and medical devices implanted in the human body. PAE presents evidence that defendants have obtained business with at least a small number of PAE customers such as BAE Systems, Lockheed Martin, Santa Barbara Focal Plan[e], Raytheon, Northrop Grumman, L3 Communications, and Superconduct-

ing Industries. Surely it is within the realm of possibilities that an important military concern of the day, such as the Apache Helicopter, or other equally important public interest, could be compromised if defendants are enjoined from contacting or conducting business with an entity that was a customer of PAE but is now doing business with RAAD, **albeit possibly through improper solicitation by defendants.**

(Order 295 F.Supp.2d 1188, at p. 1203) (Emphasis added).

The preliminary injunction was not an adjudication upon the merits of any of the plaintiff's claims, but merely a determination of whether the status quo should be preserved based on an assessment of the likelihood of plaintiff prevailing on those claims and consideration of the respective hardships suffered by the parties if the status quo were not preserved. This court found there was a fair, if not probable, chance plaintiff would succeed on more than one of the causes of action alleged in its complaint, including that related to improper solicitation. What PAE now seeks through this pending motion for partial summary judgment is an adjudication upon the merits, as a matter of law, of its improper solicitation claim. What the court recognized in its preliminary injunction analysis was not the "unique" and "incomparable" service and skill of Taylor, but the fact that certain entities were already "active" customers of RAAD and had potentially committed themselves to using RAAD products for certain projects of importance to the public interest.

The court finds as a matter of law that the non-solicitation provision at issue is reasonable and not an undue restraint of trade. Taylor submits that even so, the non-solicitation provision was effective only until November 30, 2002, six months after the two year term of his renewed employment agreement expired on May 31, 2002. Taylor asserts it is because he was terminated without cause that there is only a six month prohibition on solicitation of PAE customers. (See Taylor Dep. at pp. 33–38, Ex. 3 to Declaration of John W. Beuhler, Jr.; Petri Declaration at pp. 2–3, Ex. 12 to Supplemental Declaration of John W. Beuhler, Jr.). Section 6.3 of Taylor's employment agreement provides that "[i]f the Employee's employment is terminated pursuant to this Section 6.3 [Termination without Cause], the time periods stated in Section 5.2 shall be changed to six months." [5] PAE contends Taylor voluntarily resigned or was terminated with cause. (See e.g., Declaration of PAE CEO Don Wright at Paragraphs 22–31, Ex. 6 to Morrill Declaration). While this fact is disputed, it is not a fact which is material to this court's adjudication of the solicitation claim as a matter of law (although it may material to determination of the length of the solicitation prohibition).

Taylor acknowledges that the day he left PAE (August 22, 2002), he contacted Northrop Grumman in Baltimore, Maryland to inform it he had left PAE and was going to start his own business. Taylor admits Northrop Grumman Maryland is a customer of PAE. (Taylor Dep. at pp. 62–65). Even if the restrictive period was only six

---

**5.** PAE contends Section 6.3 did not survive the expiration of the contract term on May 31, 2002 and therefore, was not operational when Taylor ceased his employment with PAE on August 22, 2002. That is a strained and unreasonable interpretation of Taylor's employment agreement. Although Section 6.3 is not specifically mentioned in Section 5.4.1 of the agreement as one of the provisions which survives the expiration of the contract term, Section 6.3 specifically refers to Section 5.2 (the non-solicitation provision) which is one of the sections specifically mentioned in Section 5.4.1 (the "Survival" provision).

months, this particular contact occurred within that period and violated the non-solicitation provision.

Because of this violation, Section 5.4.1 of Taylor's employment agreement comes into play. That section provides:

> The provisions of Section[ ] ... 5.2 shall survive the expiration of the contract term, irrespective of the reasons therefor. In the event of any such violation of Section[ ] ... 5.2 ... the Employee further agrees that the time period[ ] set forth in such section[ ] **shall be extended by the period of such violation.**

(Emphasis added). PAE maintains that because of Taylor's breach of the non-solicitation provision, he is prohibited from contacting, directly or indirectly, any customers of PAE until at least May 2004 because "Section 5.4.1 ... extends the restricted period in the event of a breach, effectively restarting the two-year period with each violation." And because Taylor's most recent breach of the non-solicitation provision occurred in June 2003, according to PAE, the provision is now effective until June 2005 (two years from June 2003).[6]

The court is perplexed by PAE's argument because Section 5.4.1 says "shall be extended by the period of such violation," not that it "shall be extended by the term of the contract." The question then is what is the "period of such violation" for determining how long the non-solicitation provision is effective. Whatever the answer to that question may be, however, this much is true: Taylor violated the non-solicitation provision by contacting Northrop Grumman Maryland on August 22, 2002 and PAE is entitled to summary judgment on its solicitation claim.

## C. Relief

■■■ PAE asserts it has and will continue to suffer irreparable harm as a result of defendants' use of confidential information to contact PAE customers. PAE asserts that calculating damages from the use of this information is difficult to do with certainty and therefore, Taylor and Petri should be permanently enjoined from any further disclosure or use of such information for themselves or on behalf of any other entity. PAE says Taylor and Petri "should be prohibited from continuing their attempts-so far unsuccessful- to divert to RAAD any projects they learned about during their employment at PAE and from continuing to solicit business from engineers, designers, or buyers they learned about while at PAE."

■■■ A permanent injunction is warranted because of the apparent difficulty in calculating monetary damages arising from defendants' use of PAE's confidential customer information. This information has the potential for being used not only to divert to RAAD projects which Taylor and Petri learned about during their employment, but also other projects which Taylor and Petri did not learn about during their employment at PAE. Making the link between use of the information and the projects, especially projects Taylor and Petri did not learn about while employed at PAE, would be difficult. As plaintiff aptly

6. In Requests for Admission served upon him and answered by him in July 2003, Taylor admits he and Petri met with representatives of Northrop Grumman Maryland between June 2003 and "the present;" admits he met or spoke with a representative of Raytheon El Segundo between August 22, 2002 and June 10, 2003; admits he met or spoke with a representative of Superconductor Technolo- gies between August 22, 2002 and June 10, 2003; and admits he met with and/or spoke with a representative of BAE Systems between June 11, 2003 and the present. (Ex. 47 to Morrill Declaration). RAAD currently has purchase orders from Northrop Grumman Maryland, Superconductor Technologies, Raytheon El Segundo and Santa Barbara Focal Plane for qualification lots.

puts it, "it is impossible to tell whether particular relationships Defendants have established and any future business they might secure derive from Defendants' unlawful use of confidential information ... or from other considerations." Intangible injuries, such as damage to goodwill, qualify as irreparable harm. *Regents of Univ. of Cal. v. American Broadcasting Cos.*, 747 F.2d 511, 519–20 (9th Cir.1984).

What is problematic, however, is fashioning a permanent injunction which is detailed enough so defendants know exactly what is unlawful behavior, but which does not unduly and unfairly prevents defendants from conducting business.[7] It appears to this court that not every bit of PAE's customer information is "confidential." Indeed, PAE seems to concede as much by its statement that "most if not all the information defendants took and used was confidential." The court will ask PAE to propose language to be included in a permanent injunction which addresses the court's concerns and defendants will be given an opportunity to comment upon the proposed language.

PAE also asks the court to enjoin defendants from any further contact with PAE customers until June 2005. As discussed above, it is not clear whether the non-solicitation provision, in conjunction with the other terms in Taylor's employment agreement, can be construed to extend the solicitation prohibition for that length of time. Therefore, the court will ask that PAE file and serve an additional brief addressing the court's concern about the appropriate length of the non-solicitation provision. Defendants will be given an opportunity to respond thereto.[8] In the meantime, the preliminary injunction prevents defendants from soliciting PAE's customers.

■■■ PAE argues, however, that the preliminary injunction allows the defendants "to continue to try to exploit the information they took from PAE by soliciting new business" from "active" customers of RAAD who are or were also customers of PAE. PAE says the exception to the preliminary injunction carved out by the court (not enjoining RAAD from continuing to do business with "active" customers "having a purchase order or project underway or completed with defendants") is no longer justified because the "[t]he completion of further discovery has revealed that RAAD has shipped only samples of parts that it **wants** to produce for PAE customers" and "RAAD has not yet shipped, or even received any orders, for production parts, let alone any orders for production of parts to be used in applications related to national defense." (Emphasis in original). Thus, PAE asserts "there is not a single piece of evidence in the record suggesting that enjoining the continued solicitation of PAE customers by Taylor and Petri would interfere in any way with the national defense or the public interest."

As to the four "active" customers of RAAD for whom PAE concedes the preliminary injunction does not currently apply (Raytheon El Segundo, Lockheed Martin Santa Barbara aka Santa Barbara Focal Plane, Northrop Grumman Maryland and Superconductor Technologies), it appears it is true that all those entities have ordered from RAAD are "qualification lots," not actual production parts.

---

7. In other words, it would be inappropriate to have an injunction which penalizes defendants indefinitely for every single contact with a PAE customer by assuming that PAE confidential customer information must have been utilized in the contact.

8. It may be that a determination will have to be made whether Taylor resigned, was terminated with cause, or was terminated without cause, in order to determine the appropriate length of the non-solicitation covenant.

Accordingly, for the time being, the court finds no compelling reason for RAAD to continue doing business with these entities and defendants will be preliminarily enjoined from soliciting, contacting, or conducting any further business with Raytheon El Segundo, Lockheed Martin Santa Barbara aka Santa Barbara Focal Plane, Northrop Grumman Maryland and Superconductor Technologies. There is the possibility one of these entities may decide it wants to order a production part from RAAD based on the qualification lot received from RAAD. If that situation develops, however, it can be brought to the court's attention and further modification of the court's preliminary injunction can be considered.

 Finally, PAE requests the court "order an accounting and impose a constructive trust upon any profits RAAD may realize in the future as a result of Taylor's and Petri's unlawful conduct prior to the Court's grant of injunctive relief." Other than Raytheon El Segundo, Northrop Grumman Maryland, Superconductor Technologies and Santa Barbara Focal Plane, it appears that RAAD's contact with entities PAE claims are its customers (i.e., REMEC, Raytheon Dallas, Lockheed Martin Chelmsford, Lockheed Martin Moorestown, BAE Systems Greenlawn)

have resulted only in quotes from RAAD to these entities, rather than actual purchase orders.[9] Thus, at this point, it does not appear there would be any revenue received from PAE by these entities. With regard to Raytheon El Segundo, Northrop Grumman Maryland, Santa Barbara Focal Plane and Superconductor Technologies, it does not appear defendants dispute these entities are customers of PAE within the purview of the non-solicitation provision.[10] The court will require defendants to account for any and all revenue received from Raytheon El Segundo, Northrop Grumman Maryland, Superconductor Technologies, Santa Barbara Focal Plane, REMEC, Raytheon Dallas, Lockheed Martin Chelmsford, Lockheed Martin Moorestown, and BAE Systems Greenlawn since August 22, 2002. Once the accounting is completed, plaintiff may move the court to order that any **profits** realized by RAAD be disgorged into a constructive trust.

## V. CONCLUSION

Plaintiff's Motion for Partial Summary Judgment (Ct.Rec.98) is **GRANTED.** Plaintiff is awarded summary judgment on its claim for breach of contract against Taylor for violation of the non-solicitation covenant in his employment agreement.

---

9. REMEC may be an exception based on certain evidence submitted by defendants, specifically the "Declaration of Rodney Arena in Response to Order to Show Cause."

10. They would be hard-pressed to do so in light of the evidence cited by plaintiff as part of its Statement of Facts Nos. 52–81. Petri estimates that 90% of the projects on which RAAD has bid involve entities which were PAE customers at the time Taylor's and Petri's employment with PAE ceased. Furthermore, Petri estimates that half of those bids with PAE customers relate specifically to products on which Taylor and Petri were working at the time their employment with PAE ceased. (Petri Dep. at pp. 52–53; Ex. 2

to Morrill Declaration). In light of this evidence, defendants are also hard-pressed to disprove that the other entities REMEC, Raytheon Dallas, Lockheed Martin Chelmsford, Lockheed Martin Moorestown, BAE Systems-were not customers of PAE at one time. Even if they were not customers within the 12 months preceding August 22, 2002, that does not matter as concerns providing relief for violations of the non-solicitation covenant. Taylor's non-solicitation covenant applies to any entity which is or was a PAE customer, whereas the preliminary injunction applies only to those entities which were PAE customers within a year of Taylor's departure from PAE (August 22, 2002).

Plaintiff is also awarded summary judgment on its claims for breach of contract and breach of common law duties of confidentiality and loyalty against Taylor and Petri for use of confidential PAE customer information.

Within ten (10) days of the date of this order, PAE shall serve and file proposed language for an injunction permanently enjoining defendants from using confidential PAE customer information. Within ten (10) days thereafter, defendants may serve and file any comments they have regarding the proposed language.

Within ten (10) days of the date of this order, PAE shall serve and file a brief addressing the court's concerns about the length of the non-solicitation covenant. Within ten (10) days thereafter, defendants may serve and file any response thereto.

Within ten (10) days of the date of this order, defendants shall provide PAE with an accounting for any and all revenue received from Raytheon El Segundo, Northrop Grumman Maryland, Superconductor Technologies, Santa Barbara Focal Plane, REMEC, Raytheon Dallas, Lockheed Martin Chelmsford, Lockheed Martin Moorestown, and BAE Systems Greenlawn since August 22, 2002. Upon receipt of that information, PAE may move the court for any further relief it believes appropriate in light thereof.

The June 20, 2003 preliminary injunction remains in effect, although it is hereby **MODIFIED** so that **defendants are preliminarily enjoined from soliciting, contacting, or conducting any further business with Raytheon El Segundo, Lockheed Martin Santa Barbara aka Santa Barbara Focal Plane, Northrop Grumman Maryland and Superconductor Technologies.**

**IT IS SO ORDERED.** The District Executive is directed to enter this order and forward copies to counsel.