# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GRIFFIN MACLEAN, INC., a Washington Corporation,<br><br>      Respondent,<br><br>      v.<br><br>RYAN A. HITES, an individual; ANTHONY P. NEVILLE, an individual; and VICTORY INSURANCE SOLUTIONS CORPORATION, a Washington Corporation,<br><br>      Appellants. | No. 81584-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, J.P.T. — Ryan Hites, a former employee of the insurance agency, Griffin MacLean, Inc.,[1] appeals a summary judgment ruling that a nonsolicitation agreement he executed was valid and a finding that he breached that agreement by soliciting business from Griffin MacLean clients after leaving its employ. Hites also appeals the trial court's posttrial modification of the jury verdict and the entry of judgment against him on Griffin MacLean's claim of tortious interference with a business expectancy.

---

[1] While this appeal was pending, Griffin MacLean's name was changed to TD Insurance, Inc. For the sake of clarity, we refer to the company as Griffin MacLean. Also while the appeal was pending, Hites, Anthony Neville, and Victory Solutions Corporation filed for bankruptcy protection. Once the bankruptcy proceedings were resolved, Neville and Victory settled with Griffin MacLean and stipulated to the dismissal of their appeal. Hites remains the sole appellant.

We affirm the trial court's order granting partial summary judgment to Griffin MacLean on its contract claim but we reverse judgment against Hites on the tortious interference claim because the jury did not find that Hites committed this tort. We remand for the trial court to enter a judgment on this claim consistent with the jury's verdict.

FACTS

Griffin MacLean is an insurance broker with between 5,000 and 6,000 clients. Its owners, Paul Dent and Robert Tobeck, purchased the agency from Tobeck's father-in-law in 2007. The majority of the agency's practice involves commercial insurance. Over the years, as the firm grew, Dent and Tobeck acquired three other agencies. One of the agencies Griffin MacLean purchased was Neville & Neville, owned at least in part by Anthony Neville. Griffin MacLean purchased all of Neville's customer lists and files as well as the company's good will for $1.3 million. It also hired Anthony Neville to work for Griffin MacLean as one of its sales team. In November 2011, Neville executed an agreement with Griffin MacLean in which he agreed he would not solicit company customers for a two-year period if he left the firm's employ.

In 2015, Ryan Hites approached Griffin MacLean for employment in insurance sales. On May 22, 2015, Griffin MacLean offered Hites a position as an insurance sales associate. Because Hites lacked insurance experience, Griffin MacLean offered to pay Hites a salary for his first three years, decreasing incrementally as he began earning commissions.

Hites accepted this offer and one week later, on May 29, Hites signed the same nonsolicitation agreement that Neville had signed in 2011 (the "Agreement"). The Agreement prohibited Hites from soliciting Griffin MacLean clients, from competing with Griffin MacLean for business with those clients, and from interfering with Griffin MacLean's relationship with those clients or with existing employees, for a period of two years after termination. It also prohibited Hites from using or disclosing company trade secrets at any time except as required in the course of his employment with Griffin MacLean.

On October 19, 2018, Neville and Hites did not show up to work. According to Tobeck, shortly after 9 a.m. that morning, he received an email from an attorney representing Hites and Neville. In this letter, counsel explained that the two men wanted to leave Griffin MacLean's employ "without the encumbrance of a post-employment restraint." The attorney claimed that the agreements lacked consideration and were unenforceable. The two employees also alleged that they were owed unpaid commissions. The letter sought an agreement from Griffin MacLean that the men could solicit "their clients" without restraint.

The following Monday, October 22, 2018, Hites and Neville formed a new insurance company, Victory Insurance Solutions Corporation (Victory). Hites and Neville immediately began soliciting business from Griffin MacLean clients, often informing them that Griffin MacLean lacked the expertise to continue servicing their insurance needs. These solicitations were successful and numerous clients notified Griffin MacLean of their decision to name Victory as their broker of record.[2]

---

[2] Paul Dent, President of Griffin MacLean, explained that changing the broker of record "can allow Neville and Hites to take the client's entire portfolio." In the insurance industry, underwriting services

On November 9, 2018, Griffin MacLean filed a lawsuit against Hites and Neville, seeking an injunction prohibiting Neville and Hites from violating their Agreements. Griffin MacLean later added Victory as a defendant and asserted claims of breach of contract against Hites and Neville, and claims of unjust enrichment and tortious interference with its business against all three defendants.

Hites and Neville, in answer to the amended complaint, raised five affirmative defenses: laches, unclean hands, unspecified illegality by Griffin MacLean, estoppel, and lack of consideration. They also asserted counterclaims, alleging that the restraints on their business activities were illegal and that Griffin McLean had unilaterally reduced their commissions without notice or consent in violation of RCW 49.52.050 and RCW 49.48.010. They later added a claim for nonpayment of overtime under chapter RCW 49.46.

On January 23, 2019, the court granted Griffin MacLean's request for a temporary restraining order (TRO), prohibiting Hites and Neville from contacting or rendering professional insurance services to any Griffin MacLean client and restrained them from interfering in Griffin MacLean's relationships with its employees.

The court granted a preliminary injunction in Griffin MacLean's favor on February 13, 2019. The court found that at least fifteen clients had moved their business from Griffin MacLean to Victory and that Neville and Hites had solicited

---

only allow one broker to quote a policy to a potential client. Therefore, once a quote is given, other brokers are prohibited from quoting the same policy. And brokers who are listed as a broker of record for a client are given preference to quote policies to that client. Once Neville and Hites had clients identify Victory as their broker of record, they were given priority to provide renewal quotes for other policies held by the client, which effectively gave them priority to each client's entire insurance portfolio.

additional Griffin MacLean clients. Like the TRO, the injunction prohibited the former employees from soliciting or accepting insurance business from any Griffin MacLean client and barred them from interfering in Griffin MacLean's relationships with these clients.

After entry of this injunction, Griffin MacLean discovered that Neville and Hites continued to solicit business from, and provide insurance services to, Griffin MacLean clients in violation of the preliminary injunction. The trial court held Hites and Neville in contempt for violating that order.

Approximately two months before trial, Griffin MacLean filed a motion for partial summary judgment on its breach of contract claim, arguing that the Agreement Hites signed was valid and that Hites had breached it. Griffin MacLean further sought the dismissal of Hites' counterclaim for unpaid commissions and asked the court to limit any overtime counterclaim to the three years preceding the claim.

In responding to this motion, Hites stipulated that his Agreement was "valid and binding" except for the certain defenses raised in his responsive brief.[3] The defenses he specifically raised were: (1) the Agreement lacked sufficient consideration; (2) Griffin MacLean's alleged violation of wage laws constituted a "material breach" of the Agreement, which suspended its right to demand performance by Hites; (3) Griffin MacLean's failure to pay wages it owed him gave

---

[3] Hites did not raise the defenses of laches or estoppel either on summary judgment or on appeal. We therefore deem these defenses to have been waived. *Rapid Settlements, Ltd.'s Application for Approval of Transfer of Structured Settlement Payment Rights v. Symetra Life Ins. Co.*, 166 Wn. App. 683, 695, 271 P.3d 925 (2012) (defendant waives right to assert an affirmative defense if he fails to raise the defense at trial).

it "unclean hands," precluding the company from enforcing the Agreement; and (4) section 4 of the Agreement, which precluded Hites from using any claim against Griffin MacLean as a defense to enforcement of the Agreement, was unconscionable.[4] Hites, however, presented no evidence to support any affirmative defense or counterclaim. Hites instead sought relief under CR 56(f), arguing that the court should defer ruling on the dismissal of his counterclaims because Griffin MacLean had not yet produced all of the records Hites sought in discovery.

The trial court rejected Hites' CR 56(f) request and granted partial summary judgment in favor of Griffin MacLean. The court concluded that the Agreement was valid, reasonable, and supported by adequate consideration. The court further found that Hites breached the Agreement, rejecting the argument that his nonperformance was excused by any alleged breach by Griffin MacLean because Hites had failed to offer any evidence supporting his counterclaims. The court dismissed Hites' unpaid commission claim, the dismissal of which Hites does not challenge on appeal.

On reconsideration, Hites admitted he had not presented evidence to support his affirmative defenses and counterclaims but said he did not do so because Griffin MacLean had not moved to dismiss them. The trial court declined to reconsider its summary judgment order, stating:

> Defendants pleaded the following five affirmative defenses: laches, lack of clean hands, illegality of Plaintiff's conduct and the conduct of its principal, Paul Dent, estoppel and failure of consideration. . ..

---

[4] Section 4 provided:

> The existence of any claim or cause of action the Employee against the Employer, whether predicated on his or her employment with the Employer, shall not constitute a defense to the enforcement by the employer of these covenants.

> Defendants did not specify which affirmative defenses related to which claims. Defendants failed to plead as an affirmative defense that Griffin MacLean committed the first material breach, and, to the extent that "first material breach" is not an affirmative defense that requires pleading but is a doctrine, additionally failed to demonstrate in response to Griffin MacLean's motion that the doctrine of first material breach prevented summary judgment . . ..

The court concluded that Griffin MacLean "necessarily put at issue" Hites' defenses to enforceability of the Agreement by seeking a ruling that the Agreement was valid. The trial court considered the affirmative defenses Hites presented and concluded that "none could successfully prevent enforcement of the Noncompete Agreement as a matter of law." It further ruled that under section 4 of the Agreement, Hites could seek affirmative relief for his wage claims against Griffin MacLean but could not use such claims to avoid his obligations under the Agreement.

With regard to Hites' affirmative defenses, the court clarified that it was dismissing only those defenses that related to the enforceability of the Agreement or related to any factual claim that Hites had not breached the Agreement. All other affirmative defenses to Griffin MacLean's tort claims, it held, remained for trial.

The parties tried the remaining claims and counterclaims in February and March 2020. The jury awarded Griffin MacLean $352,201 in damages against Hites for his breach of contract. The jury also found in favor of Griffin MacLean on its tortious interference claim and awarded it an additional $319,650 in damages. On Hites' overtime claim, the jury found that Griffin MacLean had failed to pay Hites $1,800 in overtime compensation but found that the nonpayment was not willful. The court subsequently awarded Griffin MacLean attorney fees and costs of $682,806. Hites appeals.

ANALYSIS

A.  Partial Summary Judgment on Griffin MacLean's Contract Claim

Hites contends the trial court erred in granting partial summary judgment in favor of Griffin MacLean on its breach of contract claim.  We disagree.

1.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  CR 56(c).  The moving party bears the initial burden of establishing that it is entitled to judgment because there are no disputed issues of material fact.  *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).  If a party makes that initial showing, then the burden shifts to the non-moving party to establish there is a genuine issue for the trier of fact.  *Id.* at 225-26.  We review summary judgment decisions de novo, engaging in the same inquiry as the trial court.  *Evanston Ins. Co. v. Penhall Co.*, 13 Wn. App. 2d 863, 870, 468 P.3d 651 (2020).

2.  Dismissal of Hites' Affirmative Defenses

Hites initially argues the trial court impermissibly dismissed his affirmative defenses—defenses he claims Griffin MacLean did not raise in its summary judgment motion.  We reject this argument.  Hites was on notice that Griffin MacLean's motion challenged any affirmative defense to the validity of the Agreement and his claimed justification for breaching it.

First, Hites stipulated that the Agreement was "valid, binding, [and] enforceable" except for defenses he chose to raise in his responsive pleading.

Hites identified only four specific defenses on which he relied to avoid liability under the Agreement. The trial court rejected each of these four arguments.

Hites contends that the dismissal of his affirmative defenses violated *Robbins v. Mason County. Title Ins. Co.*, 195 Wn.2d 618, 462 P.3d 430 (2020). We disagree. In that case, the Squaxin Island Tribe sought to enter Robbins' property to harvest clams under an 1854 treaty. *Id.* at 623-24. Robbins tendered the tribe's claim to his title insurance company, Mason County Title Insurance Company (MCTI), arguing it had a duty to defend him against the Squaxin Island Tribe's treaty rights. *Id.* MCTI denied coverage and a defense. *Id.* at 624.

When Robbins sued MCTI for coverage, MCTI raised 10 affirmative defenses, including statute of limitations, laches, the failure to mitigate damages, and waiver. *Id.* at 624, n.5. On cross motions for summary judgment on whether MCTI had a duty to defend, the trial court concluded MCTI had no duty to defend, granted its motion and denied Robbins' cross-motion. *Id.* at 624.

The Supreme Court reversed, concluding that MCTI had a duty to defend. The court rejected Robbins' argument that MCTI was estopped from denying coverage under the policy, holding that MCTI would be estopped from denying coverage only if none of MCTI's affirmative defenses applied. *Id.* at 635. But these affirmative defenses remained to be adjudicated. Because Robbins' motion had not raised legal or factual issues relating to any of MCTI's affirmative defenses, it concluded that MCTI was not on notice that Robbins sought summary judgment on these defenses and they remained to be resolved by the trial court. *Id.* at 637.

*Robbins* does not require us to reverse summary judgment. First, Hites was on notice that Griffin MacLean sought a legal ruling that the Agreement was "reasonable, enforceable, and binding." Griffin MacLean explicitly argued that the Agreement was supported by consideration, discussing Hites' unsuccessful reliance on *Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 100 P.3d 791 (2004), in opposing the employer's request for preliminary injunctive relief. It also specifically argued that the Agreement did not violate any Washington public policy and was therefore lawful. The request for relief and arguments set out in Griffin MacLean's motion gave Hites notice that it was challenging his affirmative defenses of lack of consideration and illegality. *Robbins* does not apply when a moving party's requested relief clearly puts at issue the nonmoving party's affirmative defenses.

Second, by seeking a factual finding that Hites had breached the Agreement, Griffin MacLean also put at issue any facts that might have excused or justified Hites' conduct. Yet, Hites failed to produce any evidence to establish a justification for his breach. While Hites argued he could not be liable for breach if Griffin MacLean breached the agreement first by not paying wages owing to him, he presented no evidence to support his contention that Griffin MacLean had, in fact, breached any provision of the Agreement. *Robbins* does not modify well-established law under *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 770 P.2d 182 (1989) that when a moving party presents evidence to establish certain dispositive facts, the nonmoving party must come forward with evidence to dispute those facts. Hites did not do so.

Third, Griffin MacLean asked the court to find it had paid Hites and Neville "all commissions owed them during their employment." Griffin MacLean presented evidence that it had conducted an audit and confirmed that it had paid all commissions it owed to Hites. Hites was aware of the relief Griffin MacLean sought on summary judgment because he specifically argued that "the overtime (wage theft) and commission reduction are valid defenses establishing the first material breach by Griffin MacLean." He asked the court to deny the employer's motion relating to the commission claim, arguing that he needed more time to conduct discovery. He presented no evidence to rebut Griffin MacLean's evidence that he had been paid all commissions to which he was entitled. Hites cannot rely on *Robbins* to claim he was denied the opportunity to litigate an affirmative defense when he clearly had notice that this factual issue was part and parcel of the employer's dispositive motion, raised it in his responsive pleadings, and chose not to present evidence to support it.

We also reject Hites' claim that the court's summary judgment order precluded him from raising an unclean hands defense at trial. In general, "'a party with unclean hands cannot recover in equity.'" *Burt v. Dep't of Corr.*, 191 Wn. App. 194, 210, 361 P.3d 283 (2015) (quoting *Miller v. Paul M. Wolff Co.*, 178 Wn. App. 957, 965, 316 P.3d 1113 (2014)). Those who act unjustly or in bad faith are deemed to act with unclean hands. *See Miller*, 178 Wn. App. at 965; *Burt*, 191 Wn. App. at 210-11. But this equitable doctrine does not apply to a legal claim for breach of contract. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173-75 (9th Cir. 1989). Unclean hands is a defense to a party's request for equitable

relief. *J.L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 73, 113 P.2d 845 (1941). And an injunction is one such equitable remedy. *Bellevue Square, LLC v. Whole Foods Mkt. Pac. Nw., Inc.*, 6 Wn. App. 2d 709, 716, 432 P.3d 426 (2018). Nothing precluded Hites from raising an unclean hands defense to Griffin MacLean's request for permanent injunctive relief.

And, in fact, he did raise this affirmative defense in post-trial motions. The trial court considered, and rejected, Hites' unclean hands argument. The trial court found:

> The Court rejects Defendants' assertion that the Court should not enter injunctive relief due to unclean hands by GM on the basis that GM failed to pay overtime to Hites and Neville. The misclassification of employees at GM is not directly related to enforcement of the Agreements and their restrictive covenants. The jury's finding for Hites and Neville on their claim for overtime, including the jury's finding that the failure was not willful, does not prevent injunctive relief enforcing the restrictive covenants. The claims are separate and the Court is not persuaded that GM should be denied equitable relief.

Hites does not challenge this ruling on appeal.

We conclude the trial court did not err in dismissing any affirmative defense that related to the validity of Hites' Agreement or to Griffin MacLean's claim of breach. And we also conclude that the trial court did not dismiss Hites' unclean hands affirmative defense on summary judgment. It considered and rejected it after trial as unconvincing.

4.     Validity of Agreement

Hites next argues the trial court erred in concluding on summary judgment that the Agreement was enforceable and supported by consideration. We disagree.

a. Consideration

Hites argues the Agreement lacked consideration because he began to work for Griffin MacLean before he executed the Agreement. But the record on summary judgment did not support this argument.

Washington courts have historically enforced noncompetition agreements if reasonable and supported by consideration. *Labriola*, 152 Wn.2d at 833. Consideration is a bargained-for exchange. *Id.* We do not inquire into the adequacy of consideration and instead use a legal sufficiency test. *Id.* at 834. Legal sufficiency is "concerned not with comparative value but with that which will support a promise." *Id.* (quoting *Browning v. Johnson*, 70 Wn.2d 145, 147, 422 P.2d 314 (1967). The sufficiency of consideration is a question of law for the court to decide. *Evans v. Or. & W.R. Co.*, 58 Wash. 429, 434-35, 108 P. 1095 (1910).

"The general rule in Washington is that consideration exists if the employee enters into a noncompete agreement when he or she is first hired." *Labriola*, 152 Wn.2d at 834. If, however, the employer seeks to modify the terms of employment after the employee is hired by requiring the employee to execute a noncompetition agreement, the employer must provide some independent consideration to support the new agreement. *Id.*

Hites relies on *Labriola* to argue that his Agreement lacked consideration because he signed it after he started working for Griffin MacLean. But Hites failed to submit any evidence to support this factual contention. The only evidence presented at the summary judgment stage was the declaration of Paul Dent, Griffin MacLean's president. Dent testified:

- 13 –

Ryan Hites ("Hites") entered into an agreement with GM on May 29, 2015 as a prerequisite and condition of his employment with GM (the "Hites Agreement"). Hites was offered the job on Friday, May 22, 2015. He completed his new hire paperwork and dropped it by the office on May 29, 2015. Hites could not, however, begin working immediately as he was not licensed when hired. He had to complete Property and Casualty licensing school. He also had a pre-planned vacation during the month of June. Hites obtained his license on June 17, 2015 and was able to legally work as an insurance salesman only after that.

Moreover, the Agreement explicitly recited that the employment itself was the consideration Griffin MacLean was offering Hites:

In consideration of the Employer employing the Employee in a position wherein he or she will gain specialized knowledge and experience and will establish personal relationships with Employer's customers, buyers, and other employees, the Employee covenants and agrees as follows: . . .

This recital evidenced the parties' intent to condition employment on execution of the Agreement.

Although Hites submitted a declaration at the preliminary injunction stage in which he claimed he began working on May 22, 2015, he did not submit this evidence on summary judgment and did not reference it in his responsive pleading, and the trial court did not identify this declaration in the list of evidence it considered at summary judgment.[5]

---

[5] In Hites' declaration filed in opposition to Griffin MacLean's motion for a preliminary injunction, he testified that he "began providing insurance services to GM by May 22, 2015 at the latest." This declaration was docket number 49. In his opposition to Griffin MacLean's motion for summary judgment, Hites referenced exhibit B of this declaration, but did not otherwise call the court's attention to the testimony of the declaration. In ruling on summary judgment, the court noted "If a party believes there are materials already on file with the Court that bear on summary judgment, the party should adequately identify those materials" and indicated that it considered "Docket #49 Exhibit B." We interpret this order to mean that, because Hites called attention only to exhibit B, the court did not consider the declaration as a whole and did not consider his testimony therein.

Hites contends the trial court's ruling runs afoul of the holding in *Schneller v. Hayes*, 176 Wash. 115, 28 P.2d 273 (1934). We disagree. In *Schneller*, the court held that a noncompetition agreement that an employee signed after starting to work for the employer lacked consideration. But the *Schneller* agreement, unlike Hites' Agreement, explicitly stated that the employee "has been employed" by the employer, reflecting the fact that the employee had begun working for the employer before he signed the noncompetition agreement, a document he signed three weeks later. 176 Wash. at 116-18. Additionally, the *Schneller* employer "promised [the employee] nothing in the way of future employment and stipulated nothing as to wages." *Id.* at 118-19. It made no mention of any "instruction and experience" the employee would receive while in the company's employ as consideration for the noncompetition agreement. *Id.* at 120-21. In fact, it acknowledged that the employee was a licensed optician, already competent and trained to perform the job. *Id.* at 121.

Unlike *Schneller*, Hites' Agreement explicitly stated that Griffin MacLean was providing Hites with employment, specialized training and access to Griffin MacLean's customers, buyers and employees, as the bargained-for exchange. *Schneller* is distinguishable. We conclude Hites' Agreement was supported by sufficient consideration.

b.    Public Policy and Unconscionability

Hites next argues that the trial court "erred in failing to properly consider public policy" arguments he raised to challenge the Agreement's validity. He relies on a statute enacted in July 2019, Engrossed Substitute House Bill 1450, 2019

Wash. Laws, chapter 299, now codified in chapter 49.62 RCW, to bolster his contention that the Agreement violates public policy.

Prior to the passage of ESH 1450, restrictive covenants in employment agreements were enforceable. *Emerick v. Cardiac Study Ctr., Inc., P.S.*, 189 Wn. App. 711, 721-22, 357 P.3d 696 (2015). We determined whether a covenant was reasonable as a question of law that we reviewed de novo. *Id.* Our courts applied a three-part test for reasonableness (1) whether the restraint is necessary to protect the employer's business or goodwill, (2) whether it imposes on the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether enforcing the covenant would injure the public through loss of the employee's service and skill to the extent that the court should not enforce the covenant, i.e., whether it violates public policy. *Id.* (citing *Perry v. Moran*, 109 Wn.2d 691, 698, 748 P.2d 224 (1987)). The public policy factor of the reasonableness test required the court to balance possible harm to the public by not enforcing the covenant against the employer's right to protect its business. *Id.* at 728 (citing *Wood v. May*, 73 Wn.2d 307, 309-10, 438 P.2d 587 (1968)).

Hites does not challenge his Agreement under this three-part reasonableness test. Instead, he appears to argue that under chapter 49.62 RCW and the common law preceding its enactment, his Agreement is unenforceable because it was a contract of adhesion, the contents of the contract were not disclosed to him before he accepted employment with Griffin MacLean, and Griffin MacLean failed to pay him overtime to which he was legally entitled, actions he argues invalidated the restrictive covenants in the Agreement.

- 16 –

First, chapter 49.62 does not apply to Hites' Agreement. This statute expressly applies "to all proceedings commenced on or after January 1, 2020, regardless of when the cause of action arose." RCW 49.62.100. It applies retroactively only to that extent. *Id.* Griffin MacLean initiated this lawsuit in October 2018, before the new statute's effective date. The statute does not govern the validity of Hites' Agreement.

Second, chapter 49.62 does not invalidate all restrictive covenants in employment agreements. The legislature found that "agreements limiting competition or hiring *may* be contracts of adhesion that *may* be unreasonable." RCW 49.62.005 (emphasis added). Under RCW 49.62.020(1)(a), a "noncompetition covenant" is unenforceable unless the employer discloses the terms of that covenant in writing at the time the employee accepts the offer of employment, or, if entered into after employment commences, the employer provides independent consideration for the covenant. It prohibits noncompetition covenants for employees earning under $100,000 a year. RCW 49.62.020(1)(b). And it renders such covenants void if the employee is discharged as the result of a layoff unless the employer compensates the employee for the period of the covenant's enforcement. RCW 49.62.020(c). Finally, any noncompetition covenant with a duration exceeding 18 months is presumptively unreasonable and the employer must prove by clear and convincing evidence that a longer duration is necessary to protect the employer's business. RCW 49.62.020(2).

The Griffin MacLean Agreement does not fall within the scope of this statute because it is not a "noncompetition covenant." The legislature defined "noncompetition covenant" as

> Every written or oral covenant . . . by which an employee . . . is prohibited or restrained from engaging in a lawful profession, trade, or business of any kind. A "noncompetition covenant" does not include: (a) A nonsolicitation agreement; (b) a confidentiality agreement; [or] (c) a covenant prohibiting use or disclosure of trade secrets or inventions; . . .

RCW 49.62.010(4). A "nonsolicitation agreement" is defined as

> an agreement between an employer and employee that prohibits solicitation by an employee, upon termination of employment: (a) Of any employee of the employer to leave the employer; or (b) of any customer of the employer to cease or reduce the extent to which it is doing business with the employer.

RCW 49.62.010(5).

The Agreement did not prohibit Hites from engaging in his profession as an insurance agent. Griffin MacLean made it clear that it did not seek to stop Hites from pursuing that career. Instead, the Agreement merely prohibited Hites from soliciting business from existing Griffin MacLean customers with whom Hites developed a relationship solely because of the access his employer granted him. It was therefore a "nonsolicitation agreement" explicitly excluded from the scope of the statute.

Hites next cites to *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 470 P.3d 486 (2020) for the argument that his Agreement is an unconscionable "contract of adhesion." Hites contends that under *Burnett* any contract of adhesion is unconscionable. But the Supreme Court clearly rejected that argument:

> A contract is "procedurally unconscionable" when a party with unequal bargaining power lacks a meaningful opportunity to bargain,

thus making the end result an adhesion contract. The fact that a contract is an adhesion contract is relevant but not determinative. An adhesion contract is not necessarily procedurally unconscionable. The key inquiry is whether the party lacked meaningful choice.

196 Wn.2d at 54-55 (citations omitted). The *Burnett* court invalidated an arbitration provision as procedurally unconscionable, holding that Burnett lacked meaningful choice regarding the provision that appeared on page 18 of a 23-page handbook that he received after he signed a one-page employment agreement that made no mention of mandatory arbitration or the employee handbook. *Id.* at 56-57. It concluded Burnett never assented to the arbitration provision because he had no notice of it when he signed the employment agreement. *Id.* at 47.

*Burnett* does not support Hites' procedural unconscionability claim. Hites presented no evidence to support his contention that he lacked a meaningful choice when he signed the Agreement. Unlike *Burnett,* there were no terms hidden from him. The restrictive covenants were in the Agreement he signed, not in a separate document that his employer subsequently provided.

Hites separately argues that section 4 of the Agreement should be invalidated as substantively unconscionable because it effectively constitutes a waiver of common law defenses.[6], [7] He asks this court to invalidate section 4 and

---

[6] Hites appears to have raised substantive unconscionability below as to section 4 of the agreement when he argued that it violated public policy. However, Hites failed to argue that the Agreement as a whole is substantively unconscionable and we decline to address that argument on appeal. *See* RAP 9.12 (limiting our review of an order granting summary judgment to "evidence called to the attention of the trial court."); *Silverhawk, LLC v. KeyBank Nat. Ass'n*, 165 Wn. App. 258, 265, 268 P.3d 958 (2011) ("An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal.").

[7] Hites argues on appeal that Griffin MacLean impermissibly raised the validity of section 4 for the first time in its reply brief. Griffin MacLean was actually responding to Hites' argument that section 4 was an "inconspicuous" waiver of defenses that violated public policy. Griffin MacLean's response to Hites' argument was not improper.

to reverse the judgment against him to permit him to litigate the issue of whether Griffin MacLean materially breached the Agreement by failing to pay him overtime and, if so, whether that breach relieved him of the obligation of complying with its terms. We decline this request.

Hites relies on *Tadych v. Noble Ridge Construction, Inc.*, 200 Wn.2d 635, 519 P.3d 199 (2022) and *Zuver v. Airtouch Communications, Inc.*, 153 Wn.2d 293, 103 P.3d 753 (2004) to support his claim that section 4 of the Agreement is substantively unconscionable. Neither supports his argument here.

In *Tadych,* our Supreme Court stated that a contract term is substantively unconscionable where it is one-sided or overly harsh, shocking to the conscience, or exceedingly calloused. 200 Wn.2d at 641. (quotations and citations omitted). The focus, it said, is on "the effect the contractual provision has on existing statutorily established rights and the policies underlying those statutory rights." *Id.* at 642. In that case, the court invalidated a construction contract provision shortening the statute of limitations period from six years to one year. It held that this clause was substantively unconscionable because it adversely affected the homeowners' statutory right to bring a claim, benefitted the contractor while providing no benefit to the homeowner, was not prominently set out in the contract, and was not negotiated or bargained for. *Id.* at 644.

In *Zuver,* the Supreme Court examined an employment agreement in which a sales representative was required to resolve all employment claims by confidential arbitration, to waive the right to recover punitive damages, and to waive the right to seek any remedies in court, including the right to a jury trial. 153 Wn.2d

at 299. The court concluded that a provision requiring that all arbitration proceedings remain confidential was substantively unconscionable because it denied employees access to information about other discrimination claims against the employer, thereby hampering the employee's ability to prove a statutory discrimination claim. *Id.* at 315. It also invalidated the remedies waiver provision because it barred the employee from recovering punitive or exemplary damages while permitting the employer to seek these very same damages from the employee if they breached their duty of nondisclosure. *Id.* at 318.

Unlike *Tadych*, section 4 of Hites' Agreement has no effect on any of his statutory rights. It did not affect his ability to pursue wage claims against his employer. It did not shorten the time period in which to bring such claims. Unlike *Zuver*, the Agreement did not require Hites to waive any claim for damages, force him to litigate claims in arbitration, or mandate confidentiality of any dispute resolution proceeding. And unlike both cases, Hites received benefits under the Agreement—employment, specialized training and experience in the insurance industry, and access to Griffin MacLean clients, buyers, and employees. Section 4 of Hites' Agreement is not substantively unconscionable.

Nor is there a basis for finding section 4 procedurally unconscionable. The provision was not buried in the fine print or otherwise hidden. The challenged language appears in the very first sentence of that section.[8] Because section 4 is not unconscionable, either substantively or procedurally, it is enforceable. By its

---

[8] Hites also seems to argue that section 4 is not specific enough because it does not mention which defenses are covered. But he cites no authority for the proposition that enforcement requires that level of specificity, nor does he explain why the lack of a specific list of applicable defenses would render the contract unconscionable.

- 21 –

terms, it precluded Hites from raising his wage claims against Griffin MacLean as a defense to a claim for breach of contract. The trial court did not err in dismissing his defenses.

B. Tortious Interference Jury Verdict

Hites next argues that the trial court erred when it modified the jury verdict and entered judgment against Hites on Griffin MacLean's tortious interference claim. We agree.

1. Factual background

A month after trial, the parties discovered an error in the jury verdict form relating to Griffin MacLean's tortious interference claim. Griffin MacLean had asserted this claim against all three defendants: Hites, Neville, and their company, Victory. A draft of the jury verdict form asked the jury to answer the following question:

> 4. Do you find Griffin MacLean is entitled to recover on its claim of tortious interference with a business relationship or expectancy against Hites, Neville and Victory Insurance Solutions?

The court, however, edited the draft form and mistakenly removed Neville's and Hites' names from question 4. The verdict form given to the jury asked

> 4. Do you find Griffin MacLean is entitled to recover on its claim of tortious interference with a business relationship or expectancy against Victory Insurance Solutions?

Although the court provided counsel with a copy of this verdict form before it disseminated the final instruction packet to the jury, no one noticed that names were missing in question 4. And Griffin MacLean failed to object to the form even though the trial court explicitly asked "does anyone need to address anything in the

instructions, or take any exceptions?" immediately before circulating the instructions to the jury.

When Griffin MacLean discovered the error, it asked the court to amend the jury verdict to find Hites personally liable on the tortious interference claim. Hites opposed this request, arguing that the court lacked the authority to change a verdict after the jury had been discharged. The trial court concluded that the omission of Hites' name from question 4 was a scrivener's error and that the jury's verdict against Victory on the tortious inference claim necessarily meant the jury found Hites had committed the tort as well. The court held Hites, Neville, and Victory jointly and severally liable to Griffin MacLean for tortious interference, and entered judgment against Hites on this claim for $319,650, consistent with the jury's damage award to Griffin MacLean.

2.    Analysis

Hites contends the trial court erred in entering judgment against him on Griffin MacLean's tortious interference claim. He argues the verdict form was not a "special verdict" subject to modification under CR 49, and the trial court erred in relying on *Gosslee v. City of Seattle*, 132 Wash. 1, 231 P.4 (1924) to enter judgment against him in the absence of a jury finding of liability. We agree.

Once a jury renders a verdict, if that verdict requires interpretation, the trial court must determine its legal effect. *Dep't of Highways v. Evans Engine & Equip. Co.,* 22 Wn. App. 202, 205-06, 589 P.2d 290 (1978). A court may harmonize inconsistent verdict answers as long as the answers are defective in form only, not affecting the merits or rights of the parties. *McRae v. Tahitian, LLC*, 181 Wn. App.

638, 646, 326 P.3d 821 (2014). The court may not, under the guise of amending a verdict, invade the province of the jury or "'substitute its judgment for that which is within the province of the jury.'" *Estate of Dormaier v. Columbia Basin Anesthesia, PLLC,* 177 Wn. App. 828, 867, 313 P.3d 431 (2013) (quoting *Blue Chelan, Inc. v. Dep't of Labor & Indus.,* 101 Wn.2d 512, 515, 681 P.2d 233 (1984)).

To discern and implement the jury's intent, a court may examine the verdict in light of the jury instructions and evidence at trial. *McRae,* 181 Wn. App. at 645. It may also consider how our civil rules required the jury to use the verdict form. *Id.* We review the legal effect of a jury verdict de novo. *Id.*

Griffin MacLean argues that the trial court provided the jury with a special verdict form, as defined in CR 49(a), which authorized the court to make factual findings that the court inadvertently omitted from the form. We reject this argument.

Under CR 49(a), the court may submit a verdict form to the jury that asks it to make written findings on distinct issues of fact. It further provides that

> [i]f in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the rights to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such a demand, the court may make a finding . . ..

CR 49(a). Griffin MacLean contends that Hites effectively waived his right to a jury determination on the tortious interference claim because he failed to demand that the verdict form be corrected before the jury began deliberating. But this argument is premised on question 4 being characterized as a "special verdict" under CR 49(a).

While the verdict form asked the jury to make written findings of fact on several of the claims and counterclaims, it did not do so for Griffin MacLean's unjust enrichment or tortious interference claims. We therefore cannot characterize question 4 as a special verdict.

Our Supreme Court resolved a similar issue in *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 32 P.3d 250 (2001). There, three Wal-Mart shoppers alleged store employees falsely accused them of shoplifting and had them banished from the store. 144 Wn.2d at 911. Two of the men were charged with theft but the charges were later dismissed with prejudice. *Id.* The three men sued Wal-Mart and two of its employees for assault and battery, false imprisonment, malicious prosecution, civil rights violations and violations of the Consumer Protection Act (CPA). *Id.* at 912. A jury found for Wal-Mart on all claims except the CPA claim with respect to two of the three plaintiffs. *Id.* at 913. The parties claimed the verdicts in favor of Wal-Mart on the discrimination claim but against Wal-Mart on the CPA claim were inconsistent. *Id.* The court granted Wal-Mart's CR 50(b) motion to set aside the CPA verdicts "given the determination that there was no discrimination" against the plaintiffs. *Id.* at 913.

The court reversed this ruling. It described the verdict as a series of yes/no questions relating to each of the plaintiffs' claims. *Id.* at 918. It rejected the court of appeals' characterization of this series of questions as a special verdict form or a general verdict with special interrogatories because the answers to each question resolved the ultimate question of each claim. *Id.* It concluded that the verdicts were

general verdicts under CR 49(-), and not special verdicts under CR 49(a). *Id.* at 918.

Here, as in *Guijosa*, the jury was not asked to make specific written findings of fact on the elements of Griffin MacLean's tortious interference claim. Instead, the jury was asked to decide the ultimate question of liability: "do you find Griffin MacLean is entitled to recover on its claim of tortious interference with a business relationship or expectancy against Victory?" This verdict is a general verdict, not a special verdict, and CR 49(a) does not apply. As a result, the trial court did not have the authority under the civil rules to find facts that it did not ask the jury to find.

Hites next contends that the trial court erred in relying on *Gosslee* to determine whether the jury intended to hold Hites liable for tortious interference. We agree. In *Gosslee*, our Supreme Court recognized the well-established rule that "the trial court, *before the jury is discharged*, may direct it to correct irregularities in its verdict, or it may itself do so, in such way as that it will express the intent of the jury." 132 Wash. at 2 (emphasis added). The rule allows the court to amend the verdict to "give effect to what the jury unmistakably find[s]." *Id.*

In that case, the jury issued a general verdict in favor of the plaintiff and against the defendant whom the jury identified as "Corwin auto." *Id.* at 1. The trial court handed the verdict form to the foreman of the jury and, in the presence of the other jurors in open court, directed the foreman to write in the names of the actual named defendants. *Id.* at 2. The foreman changed the verdict to strike the words "Corwin auto," and to insert the names of the individually named defendants, Winifred Corwin, F.W. Corwin, and Jane Doe Corwin. *Id.* at 2. The court then

polled the jury and each answered that the amended verdict was their verdict. The amended verdict was then filed with the clerk and judgment was entered on it. *Id.*

The Supreme Court rejected the defendants' challenge to the manner in which the court had the jury amend its verdict. It stated, "[i]f from the verdict itself, the pleadings, and the instructions of the court to the jury . . . , we can say that the verdict, as finally corrected by the direction of the court, was that which the jury intended to render, then there would be no error." *Id.* at 3. It noted that the complaint alleged negligence in the operation of an automobile, alleged that the driver was Winifred, the daughter of F.W. and Jane Doe, and alleged she was driving her parents' car with their knowledge and consent, in connection with their business. The case was submitted to the jury on the theory that the Corwins were all liable or none was. *Id.* The jury was explicitly instructed that if they found that Winifred was negligent and proximately caused the damage, then "your verdict will be against such defendant and her parents; that is, against all of the three Corwin defendants." *Id.* at 3-4. These instructions, along with the court's polling of the jury after the corrections were made, led the court to conclude that the amended verdict reflected the jury's intent. *Id.* at 3-4.

The trial court here followed the analytical process of *Gosslee* by looking at whether Griffin MacLean had asserted a tortious interference claim against all three defendants, whether it presented evidence at trial to establish the liability of all three, and whether the jury instructions as a whole supported the conclusion that the jury's verdict on the tortious inference claims "necessarily resolves the claim in Griffin MacLean's favor against all three defendants."

- 27 –

But *Gosslee* does not give trial courts the authority to change a jury's general verdict after that jury has been discharged. First, *Gosslee* explicitly relied on the principle that the court may ask a jury to correct an irregularity in a verdict *before the jury was discharged*. It did not address the court's authority to amend a verdict after discharge.

Second, the instructions in *Gosslee* explicitly informed the jury that if it found the driver negligent, it had to enter a verdict against all three defendants. In this case, no such instruction was given to the jury. A plaintiff must prove five elements to establish a case of tortious interference with a business expectancy. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006). Specifically, a plaintiff must show (1) the existence of a valid business expectancy, (2) that the defendant had knowledge of that expectancy; (3) an intentional interference inducing or causing the termination of the expectancy; (4) that the defendant interfered for "an improper purpose or used improper means;" and (5) resultant damage. *Id.; Greensun Grp., LLC v. City of Bellevue*, 7 Wn. App.2d 754, 767-68, 436 P.3d 397 (2019). The trial court instructed the jury as to these elements. It defined "[i]nterference for improper purpose" as "interference with an intent to harm GM." It defined "[i]nference by improper means" as "interference that violates a statute, a regulation, a recognized rule of common law, or an established standard of the trade or profession."

The trial court instructed the jury that it had found that Hites and Neville had interfered with Griffin MacLean's clients by breaching their respective nonsolicitation agreements. But it left for the jury to find whether Hites acted for an

improper purpose or by improper means. We have no finding from the jury on this element of the tortious interference claim. Reading such a finding into the verdict against Victory invaded the province of the jury to make this finding in the first instance.[9]

Griffin MacLean argues the trial court merely corrected an error in the form of the verdict, as in *McRae*. But that case is clearly distinguishable. A former motel manager brought a number of employment claims against her employer and the motel's owners. *McRae*, 181 Wn. App. at 641. McRae voluntarily dismissed all claims against the individual owners except for a withholding of wage claim, for which she sought $78.40 in unpaid wages. *Id.* McRae pursued her wrongful discharge, personal injury, withholding of wages, and intentional infliction of emotional distress against the corporate employer, seeking $35,980 in economic damages. The court submitted four verdict forms to the jury, which it returned with inconsistent answers. *Id.* at 643. The jury found in favor of McRae but awarded McRae $0 in damages against the motel. *Id.* at 642-43. Instead, the jury awarded the economic damages to McRae in the verdict form relating to the individual owners. *Id.*

After the jury was discharged, the parties argued whether the verdict forms' answers on liability and damages were inconsistent. The trial court examined the

---

[9] This case is thus distinguishable from *Gosney v. Fireman's Fund Ins. Co.*, 3 Wn. App. 2d 828, 419 P.3d 447 (2018), where the verdict form in an insurance bad faith case failed to ask the jury to award the amount of an underlying covenant judgment. This court held there that the trial court's post-trial decision to award the amount of the covenant judgment did not invade the province of the jury because the jury was properly instructed that the insurer would be liable for the amount of this judgment if the jury found the insurer had breached its duty of good faith to defend or settle. *Id.* at 861. The jury made the requisite factual finding to hold the insurer liable for this underlying judgment. *Id.* Here, we have no factual findings that would be necessary predicates to holding Hites personally liable for tortious interference.

jury's instructions, finding annotations by the jury resolving the elements of each claim, and concluded that the jury had intended to award the wrongfully withheld wages against both defendants because the jury found that both had participated in this withholding. It also concluded that the jury had intended to award the economic damages against the corporate employer because those damages related to the wrongful discharge claim and McRae had voluntarily dismissed that claim against the individual defendants. *Id.* at 643.

Division Three of this court affirmed. The court relied on special verdict answers that provided a clear indication of the jury's intent. *Id.* at 645-46. The jury explicitly found by way of special verdict that both the corporate employer and its owner wrongfully withheld wages from McRae. It also found by special verdict that the owner had acted as the employer's agent in this withholding. The court held these findings showed the jury's intent to award McRae damages against the corporate employer on her wrongful discharge claim and damages against both defendants on her wage claim. *Id.* It followed from these clear jury findings that the economic damage award had to be against the motel solely and the wage award had to be against both the motel and Ms. Li. *Id.* at 646. It concluded that the trial court's action corrected a defect in the form, and did not affect the rights of the parties. *Id.*

*McRae* is factually distinguishable. Here, we do not have a jury interrogatory answer or special verdict identifying which defendant committed tortious interference. And we have no evidence demonstrating that the jury intended to find

all three defendants liable for this claim.[10]  There was no jury instruction informing the jury that if it found that one defendant committed this tort, then it must find that all three did so.

Griffin MacLean argues that it presented evidence that both Neville and Hites tortiously interfered with its business relationships with clients.  And it contends Instruction 13 required the jury to find that all three defendants committed the tort.  But the instruction, read in context with the verdict form, did not require any such finding.  The jury was asked only whether Victory committed tortious interference.  Vicarious liability imposes liability on an employer for the torts of any employee acting on the employer's behalf.  *Smith v. Sacred Heart Med. Ctr*, 144 Wn. App. 537, 543, 184 P.3d 646 (2008).  The jury could have based its verdict against Victory on the conduct of just one of the two men.  We have no way of determining which actions of which individual formed the basis for the jury's verdict.

Griffin MacLean argues that it is not legally supportable to limit liability for tortious inference to Victory alone.  We disagree.  The law permits a plaintiff to sue a principal based on the actions of its agent without having to sue the agent personally.  *See* 16 David K. DeWolf & Keller W. Allen, Washington Practice: Tort Law and Practice § 4.25 at 256 (5th ed. 2021-22).  Counsel for Hites admitted in closing that Victory would be legally liable for the actions of Hites or Neville.  This admission provides a basis for the verdict against Victory.  But it does not

---

[10] It appears from our review of the trial transcript that a part of the trial was recorded using the trial court's electronic recording system, FTR, and a part of the trial was transcribed by a court reporter. We have on appeal only those portions of the transcript that were transcribed by the court reporter. We are thus missing significant portions of the trial transcription.  Moreover, only a few of the admitted trial exhibits have been designated for appeal.  Our review is based on this limited trial record.

demonstrate that the jury found that Hites committed this tort. Even though joint and several liability remains the rule in cases involving tortious interference with a business expectancy under RCW 4.22.070(3)(b), and in theory Hites and Victory could be jointly and severally liable, a jury must still factually find that both committed the alleged tort unless there is some other legal basis for holding Hites personally responsible for the actions of Neville.

We conclude that without a jury finding that Hites committed tortious interference, the trial court erred in imposing liability against him based on a general verdict against Victory only. We reverse the order modifying the tort verdict and remand for the court to reinstate the original jury verdict.[11]

D. Attorney Fees

Finally, Griffin MacLean asks us to award it fees on appeal. Because it has prevailed on the summary judgment issue, we award it fees as to that issue.

The prevailing party on appeal may seek reasonable attorney fees when authorized by contract. *Edmundson v. Bank of Am.*, 194 Wn. App. 920, 932-33, 378 P.3d 272 (2016) (citing *Thompson v. Lennox*, 151 Wn. App. 479, 491, 212 P.3d 597 (2009)). Here, the Agreement states that

> If Employee breaches or defaults in the performance of any of the covenants, agreements, representations or warranties described in this Agreement, then in addition to any and all of the rights and remedies which Employer may have against Employee, Employee will be liable to and pay the Employer its court costs and reasonable attorneys' fees incurred in enforcing the covenants, agreements, representations and warranties hereunder.

---

[11] Hites raises several additional errors related to the tortious interference claim. Because we reverse the tortious interference judgment as to Hites on other grounds, we do not address these arguments.

Under this provision, Griffin MacLean is entitled to an award of attorney fees to the extent the fees were incurred in prevailing on its contract claim against Hites.

CONCLUSION

We affirm the trial court's order granting partial summary judgment to Griffin MacLean on its breach of contract claim. We reverse judgment against Hites on the claim of tortious interference and remand for the trial court to enter a judgment consistent with the jury's verdict. Finally, we grant Griffin MacLean attorney fees related to its efforts to enforce the Agreement and defend the summary judgment order.

_Andrus, J.P.T._

WE CONCUR:

_Bowman, J_          _Dwyer, J._